*PRELIMINARY PRINT*

VOLUME 599 U. S. PART 1

PAGES 533–554

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 22, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## YEGIAZARYAN, AKA EGIAZARYAN *v.* SMAGIN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 22–381. Argued April 25, 2023—Decided June 22, 2023*

Respondent Vitaly Smagin won a multimillion dollar arbitration award in 2014 against petitioner Ashot Yegiazaryan stemming from the misappropriation of investment funds in a joint real estate venture in Moscow. Because Yegiazaryan has lived in California since 2010, Smagin, who lives in Russia, filed suit to confirm and enforce the award in the Central District of California pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The District Court initially froze Yegiazaryan's California assets before finally entering judgment against him. The District Court also entered several postjudgment orders barring Yegiazaryan and those acting at his direction from preventing collection on the judgment. While the action was ongoing, Yegiazaryan himself was awarded a multimillion dollar arbitration award in an unrelated matter and sought to avoid the District Court's asset freeze by concealing the funds, which were ultimately transferred to a bank account with petitioner CMB Monaco.

In 2020, Smagin filed this civil suit under the Racketeer Influenced and Corrupt Organizations Act (RICO), which provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of" RICO's substantive provisions. 18 U. S. C. § 1964(c). As relevant, Smagin alleges Yegiazaryan and others worked together to frustrate Smagin's collection on the California judgment through a pattern of wire fraud and other RICO predicate racketeering acts, including witness tampering and obstruction of justice. The District Court dismissed the complaint on the ground that Smagin had failed to plead a "domestic injury" as required by *RJR Nabisco, Inc.* v. *European Community,* 579 U. S. 325, 346. Smagin's Russian residency weighed heavily in the District Court's decision. The Ninth Circuit reversed. Rejecting the District Court's rigid, residency-based approach to the domestic-injury inquiry, the Ninth Circuit instead applied a context-specific approach and concluded that Smagin had pleaded a domestic injury because he had alleged that his efforts to execute on a California

———————
*Together with No. 22–383, *CMB Monaco, fka Compagnie Monégasquede Banque* v. *Smagin et al.,* also on certiorari to the same court.

judgment in California against a California resident were foiled by a
pattern of racketeering activity that largely occurred in California and
was designed to subvert enforcement of the judgment there.

*Held*: A plaintiff alleges a domestic injury for purposes of § 1964(c) when
the circumstances surrounding the injury indicate it arose in the United
States.   Pp. 541–549.

   (a) The "domestic-injury" requirement for private civil RICO suits
stems from *RJR Nabisco*, a case in which the Court was asked whether
RICO applies extraterritorially.   To answer the question, the Court ap-
plied the presumption against extraterritoriality, a canon of construction
that provides: "[A]bsent clearly expressed congressional intent to the
contrary, federal laws will be construed to have only domestic applica-
tion."   579 U. S., at 335.   Guided by concerns of international comity
and the reasonable discernment of congressional intent, the Court dis-
tilled the presumption against extraterritoriality into two steps.   The
first asks "whether the statute gives a clear, affirmative indication that
it applies extraterritorially."   *Id.*, at 337.   If the answer is "yes," the
presumption is rebutted, and the test ends.   If the answer is "no," the
inquiry proceeds, and step two asks whether the case involves a domes-
tic application of the statute, which is assessed "by looking to the stat-
ute's 'focus.'"   *Ibid.*   Applying this framework, the Court assessed the
extraterritoriality of RICO's private right of action, § 1964(c), and deter-
mined that it does not overcome the presumption at step one.   Proceed-
ing to step two, the Court held that "[a] private RICO plaintiff . . . must
allege and prove a *domestic* injury to its business or property."   *Id.*, at
346.   Because the *RJR Nabisco* plaintiffs were not seeking redress for
domestic injuries, the Court did not have occasion to explain what con-
stitutes a "domestic injury."   Pp. 541–542.

   (b) The parties advance competing approaches to the domestic-injury
inquiry.   Petitioners urge a bright-line rule that locates a plaintiff's in-
jury at the plaintiff's residence.   They argue that because a private
RICO action remedies only economic injuries and a plaintiff necessarily
suffers that injury at its residence where the economic injury is felt,
*any* cognizable § 1964(c) injury is necessarily suffered at the plaintiff's
residence.   Alternatively, petitioners argue that at least when *intangi-
ble* property is concerned, common-law principles locate the intangible
property at the plaintiff's residence, such that the injury is also located
there.   Smagin defends a contextual approach that considers all case-
specific facts bearing on where the injury arises.   P. 543.

   (c) The Court agrees with Smagin and the Ninth Circuit that the
domestic-injury inquiry is context specific and turns largely on the facts
alleged in the complaint.   Specifically, courts should look to the circum-
stances surrounding the alleged injury to assess whether it arose in the
United States.   Here, that means looking to the nature of the alleged

injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity.

The context-specific approach is most consistent with *RJR Nabisco.* The Court's statements in *RJR Nabisco* that the domestic-injury requirement "does not mean that foreign plaintiffs may not sue under RICO," 579 U. S., at 353, n. 12, and that "application of [the] rule in any given case will not always be self-evident," *id..* at 354, point toward a case-specific inquiry that considers the particular facts surrounding the alleged injury. That approach also better reflects the requirement's origin in step two, which assesses whether there is a domestic application of a statute by looking to the statute's focus. *RJR Nabisco* implied that § 1964(c)'s focus is injuries in "business or property by reason of a violation of" RICO's substantive provisions. So understood, § 1964(c)'s focus is not on the isolated injury but on the injury as a product of racketeering activity. This requires courts to look to the circumstances surrounding the injury to see if those circumstances sufficiently ground the injury in the United States. Pp. 543–545.

(d) The circumstances surrounding Smagin's injury make clear that the injury arose in the United States. Smagin's alleged injury is his inability to collect his judgment. Much of the alleged racketeering activity that caused that injury occurred in the United States. And while some of Yegiazaryan's scheme to avoid collection occurred abroad, the scheme was directed toward frustrating the California judgment. Further, the injurious effects of the racketeering activity largely manifested in California. Smagin obtained a judgment in California where Yegiazaryan lives, and the rights provided by that judgment exist only in California. The alleged RICO scheme thwarted those rights, thereby undercutting the orders of the California District Court and Smagin's efforts to collect on Yegiazaryan's assets in California. Under a contextual approach, Smagin's allegations suffice to state a domestic injury. Pp. 545–546.

(e) Petitioners argue that a contextual approach is inconsistent with certain common-law principles governing "the situs" of injuries to intangible property. Specifically, petitioners point to the Restatement (First) of Conflict of Laws—under which fraud is typically deemed felt at the plaintiff's residence—and to the principle of *mobilia sequuntur personam*—which generally locates intangible property at the domicile of its owner—and argue that both principles locate Smagin's alleged injury at his residence. Petitioners fail both to explain the relevance of these principles and to show that they were principles settled at common law at the time of RICO's enactment. The core problem with petitioners' reliance on legal fictions concerning the situs of injuries in other areas of the law is that the justifications of that approach do not necessarily translate to the presumption against extraterritoriality, with its

distinctive concerns for comity and discerning congressional meaning. Indeed, petitioners' approach generates results counter to comity and far afield from any reasonable interpretation of what qualifies as a domestic application of § 1964(c). Consider two U. S. businesses targeted by racketeering activity, one owned by a U. S. resident and one owned by someone living abroad. There is no evidence that Congress intended that only the former business owner can bring a § 1964(c) suit, especially since doing so runs the risk of generating international discord. Finally, petitioners argue that a contextual approach is unworkable because it does not provide a bright-line rule. Such concerns about a fact-intensive test cannot displace congressional policy choices, where a more nuanced test is true to the statute's meaning. Pp. 546–548.

37 F. 4th 562, affirmed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KAGAN, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined, and in which GORSUCH, J., joined as to Part I, *post*, p. 549.

*Vincent Levy* argued the cause for petitioners in both cases. With him on the briefs were *Gregory Dubinsky, Kevin D. Benish, Brian T. Goldman, Michael C. Tu,* and *Peter J. Brody.*

*Nicholas O. Kennedy* argued the cause for respondent in both cases. With him on the brief was *Alexander D. Burch.*†

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Respondent Vitaly Smagin holds a multimillion dollar California judgment against petitioner Ashot Yegiazaryan, who lives in California. Smagin, who resides in Russia, filed suit in the Central District of California alleging that Yegiazaryan, with the assistance of petitioner CMB Monaco (formerly Compagnie Monégasque de Banque), engaged in a pattern of

---

†*Cory L. Andrews* and *John M. Masslon II* filed a brief for the Washington Legal Foundation as *amicus curiae* urging reversal.

*Andreas Frischknecht* filed a brief for George A. Bermann as *amicus curiae* urging affirmance.

*Margaret B. Hoppin* filed a brief for Private International Law Scholars as *amici curiae.*

criminal activity, predominantly in and targeted at California, to prevent him from collecting on his California judgment, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§ 1961–1968. The District Court dismissed the complaint after concluding that Smagin had failed to allege a "domestic injury," as required by *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 334 (2016). The Ninth Circuit reversed, concluding that Smagin had alleged a domestic injury. This Court agrees with the Ninth Circuit.

## I

## A

The essential facts as alleged by Smagin are as follows. From 2003 to 2009, Yegiazaryan committed fraud against Smagin, stealing his shares in a joint real estate venture in Moscow. To avoid a Russian criminal indictment for that fraud, Yegiazaryan fled to a mansion in Beverly Hills in 2010, where he has lived ever since. In 2014, Smagin, who lives in Russia, won an arbitration award in London against Yegiazaryan for the misappropriation of his real estate investment (London Award). Yegiazaryan refused to pay that award, which is over $84 million.

Seeking to collect, Smagin filed an enforcement action in the Central District of California to confirm and enforce the London Award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U. S. T. 2517, T. I. A. S. No. 6997, as implemented by 9 U. S. C. §§ 201–208. The District Court issued a temporary protective order, followed by a preliminary injunction, freezing Yegiazaryan's California assets.

In his application for injunctive relief, Smagin informed the District Court that Yegiazaryan had been granted a substantial arbitration award in an unrelated proceeding involving Yegiazaryan and yet another Russian businessman, Suleymon Kerimov (Kerimov Award). At the time, no funds had yet been paid to Yegiazaryan in satisfaction of that

award, but Smagin was concerned that when they were paid, Yegiazaryan would take steps to transfer the money out of Smagin's reach.

Smagin's concerns were justified. In May 2015, Yegiazaryan received a $198 million settlement in satisfaction of the Kerimov Award. To avoid the District Court's asset freeze, Yegiazaryan accepted the money through the London office of an American law firm headquartered in Los Angeles. Yegiazaryan then created "a complex web of offshore entities to conceal the funds," App. 56a, and ultimately transferred the funds to a bank account with petitioner CMB Monaco. Yegiazaryan also directed those in his inner circle to file fraudulent claims against him in foreign jurisdictions, which he would not oppose, in an attempt to obtain sham judgments that would encumber the $198 million, thereby blocking Smagin's access to it.

Around the same time, Yegiazaryan was hiding his assets in the United States through a system of "shell companies" owned by family members. *Id.,* at 61a. This included a Nevada company, which was owned by his brother and created "for the purpose of sheltering [Yegiazaryan's] U. S. assets from his creditors," including Smagin. *Id.,* at 44a.

Smagin did not learn about the $198 million settlement, Yegiazaryan's efforts to hide it, or the U. S. shell companies until February 2016, when Smagin was granted leave to intervene in Yegiazaryan's California divorce proceedings. The next month, the California District Court in the London Award enforcement action granted Smagin's motion for summary judgment on his petition for confirmation of the Award and entered judgment against Yegiazaryan for $92 million, including interest. The court also issued several postjudgment orders barring Yegiazaryan and those acting at his direction from preventing collection on the judgment.

For failing to comply with those orders, the District Court subsequently found Yegiazaryan in contempt of court. To avoid having to comply with the contempt order, however,

Yegiazaryan falsely claimed he was too ill, and submitted a forged doctor's note to the District Court. When Smagin notified Yegiazaryan that he would be seeking to depose the doctor in question, who resides in California, Yegiazaryan used "intimidation, threats, or corrupt persuasion," *id.*, at 82a, to get the doctor to avoid service of the subpoena.

B

At issue here is a civil RICO suit that Smagin brought in 2020 based on the allegations just described. RICO provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of" RICO's substantive provisions. 18 U. S. C. § 1964(c). Invoking that cause of action, Smagin sued Yegiazaryan and CMB Bank (the two petitioners here), as well as 10 other defendants, in the Central District of California.[1] The complaint asserts two claims against each: a substantive RICO violation, § 1962(c), and a RICO conspiracy claim, § 1962(d). The thrust of Smagin's allegations is that the defendants worked together under Yegiazaryan's direction to frustrate Smagin's collection on the California judgment through a pattern of wire fraud and other RICO predicate racketeering acts, including witness tampering and obstruction of justice. For these violations, Smagin seeks not only actual damages "no less than $130 million," App. 100a, but also attorney's fees and treble damages as authorized under RICO. See § 1964(c).

---

[1] Only Yegiazaryan and CMB Bank petitioned for this Court's review. The other defendants include three family members (Suren Yegiazaryan, Artem Yegiazaryan, and Stephan Yegiazaryan); an alleged Russian accomplice (Vitaly Gogokhia); French, Russian, and Luxembourger individuals who have been administrators of the trust holding the $198 million (Natalia Dozortseva, Murielle Jouniaux, and Alexis Gaston Thielen); an allegedly corrupt Russian bankruptcy officer (Ratnikov Evgeny Nikolaevich); and a registered company hired by Yegiazaryan (Prestige Trust Company, Ltd.) and its U. S. lawyer (H. Edward Ryals).

The District Court dismissed the complaint on the ground that Smagin had "fail[ed] to adequately plead a domestic injury," *id.*, at 31a, as required by this Court's decision in *RJR Nabisco.* See 579 U. S., at 346 ("A private RICO plaintiff therefore must allege and prove a *domestic* injury to its business or property"). The District Court "place[d] great weight on the fact that Smagin is a resident and citizen of Russia and therefore experiences the loss from his inability to collect on his judgment in Russia." App. 27a (internal quotation marks and alterations omitted).

The Ninth Circuit reversed. It rejected petitioners' invitation to follow the domestic-injury approach of the Seventh Circuit, "which has adopted a rigid, residency-based test for domestic injuries involving intangible property," such as a judgment. 37 F. 4th 562, 568, 570 (2022) (citing *Armada (Sing.) PTE Ltd.* v. *Amcol Int'l Corp.*, 885 F. 3d 1090 (2018)). Under the Seventh Circuit's rule, which locates an injury to intangible property at the plaintiff's residence, Smagin could not allege a domestic injury because he resides in Russia. See *Armada*, 885 F. 3d, at 1094. The Ninth Circuit instead adopted a "context-specific" approach to the domestic-injury inquiry, which it found consistent with the approaches of the Second and Third Circuits. 37 F. 4th, at 568–570; see *Bascuñán* v. *Elsaca*, 874 F. 3d 806, 809 (CA2 2017); *Humphrey* v. *GlaxoSmithKline PLC*, 905 F. 3d 694, 696 (CA3 2018). Applying that approach, the Ninth Circuit concluded that Smagin had pleaded a domestic injury because he had alleged that his efforts to execute on a California judgment in California against a California resident were foiled by a pattern of racketeering activity that largely "occurred in, or was targeted at, California" and was "designed to subvert" enforcement of the judgment in California. 37 F. 4th, at 567–568.

This Court granted certiorari to resolve the Circuit split. 598 U. S. —— (2023). Because a context-specific inquiry is

most consistent with this Court's decision in *RJR Nabisco*, and because the context here makes clear Smagin has alleged a domestic injury, the Court affirms.

II

A

The "domestic-injury" requirement for private civil RICO suits stems from this Court's decision in *RJR Nabisco*. There, the question before the Court was whether RICO applies extraterritorially. To answer that question, the Court employed the presumption against extraterritoriality, which "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010). The presumption provides that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U. S., at 335.

Dual rationales support the presumption against extraterritoriality. On the one hand, it reflects concerns of international comity insofar as it "'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'" *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 115 (2013) (quoting *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991)). On the other hand, the presumption is informed by "the commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith* v. *United States*, 507 U. S. 197, 204, n. 5 (1993). In fact, consistent application of the presumption "preserv[es] a stable background against which Congress can legislate with predictable effects." *Morrison*, 561 U. S., at 261.

*RJR Nabisco* distilled the presumption against extraterritoriality into two steps. The first asks "whether the statute gives a clear, affirmative indication that it applies extraterri-

torially." 579 U. S., at 337. If the answer is "yes," then the presumption is rebutted, obviating any need to proceed to step two. If the presumption is not rebutted, however, then step two asks whether the case involves a domestic application of the statute, which is assessed "by looking to the statute's 'focus.' " *Ibid.*[2]

Applying this framework, the Court assessed the extraterritoriality of two of RICO's substantive provisions and, as relevant here, its private cause of action. As to the substantive provisions, the Court held at step one that they apply extraterritorially to the same extent that RICO's predicates do, making it unnecessary to proceed to step two. *Id.*, at 340. Regarding RICO's private right of action, § 1964(c), however, the Court's conclusion was different. The Court determined that § 1964(c) does not overcome the presumption at step one because there is no "clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id.*, at 349. "If anything," the Court reasoned, by "cabining" the private cause of action to "injur[ies] to 'business or property,' " "Congress signaled that the civil remedy is not coextensive with § 1962's substantive prohibitions." *Id.*, at 350. Accordingly, in reference to step two, the Court held that "[a] private RICO plaintiff . . . must allege and prove a *domestic* injury to its business or property." *Id.*, at 346.

In announcing this "domestic-injury" requirement, the Court did not have occasion to explain what constitutes a "domestic-injury," because the plaintiffs in *RJR Nabisco* had stipulated that they were not seeking redress for domestic injuries. *Id.*, at 354. The question now before the Court is whether Smagin has alleged a domestic injury.

---

[2] "While 'it will usually be preferable' to begin with step one, courts have the discretion to begin at step two 'in appropriate cases.' " *Western-Geco LLC* v. *ION Geophysical Corp.*, 585 U. S. ——, —— (2018) (citing *RJR Nabisco*, 579 U. S., at 338, n. 5).

B

The parties advance competing approaches to the domestic injury inquiry. Petitioners urge the Court to adopt a bright-line rule, akin to the Seventh Circuit's, that locates a plaintiff's injury at the plaintiff's residence. Petitioners advance two different versions of this rule.

As their primary position, petitioners argue that *any* injury cognizable under § 1964(c) is necessarily suffered at the plaintiff's residence because "the private cause of action remedies only economic injuries, and a plaintiff necessarily suffers that injury at its residence" where the economic injury is felt. Brief for Petitioners 2. In the alternative, petitioners argue that, at least when the alleged injury involves *intangible* property, such as the judgment here, relevant common-law principles locate the intangible property at the plaintiff's place of residence, such that the injury is also located there. *Id.*, at 2–3, 43–44. On either version of petitioners' rule, Smagin cannot allege a domestic injury because he lives in Russia.

Smagin, in contrast, defends a contextual approach that considers all case-specific facts bearing on where the injury "arises," not just where it is "felt." Brief for Respondent 9. In the context of this suit, Smagin argues that he has stated a domestic injury because he has alleged that he was injured in his ability to enforce a California judgment, against a California resident, through racketeering acts that were largely "designed and carried out in California" and were "targeted at California." *Id.*, at 3, 21.

C

The Court agrees with Smagin and the Ninth Circuit that "determining whether a plaintiff has alleged a domestic injury [for purposes of RICO] is a context-specific inquiry that turns largely on the particular facts alleged in a complaint." 37 F. 4th, at 570. Specifically, courts should look to the circumstances surrounding the alleged injury to assess whether

it arose in the United States. In this suit, that means look-
ing to the nature of the alleged injury, the racketeering ac-
tivity that directly caused it,[3] and the injurious aims and
effects of that activity.

This approach to the domestic-injury requirement is most
consistent with *RJR Nabisco.* There, the Court clarified
that its domestic-injury requirement "does not mean that
foreign plaintiffs may not sue under RICO." 579 U. S., at
353, n. 12. Similarly, the Court explained that "application
of [the domestic-injury] rule in any given case will not always
be self-evident, as disputes may arise as to whether a partic-
ular alleged injury is 'foreign' or 'domestic.'" *Id.*, at 354.
These remarks point toward a case-specific inquiry that con-
siders the particular facts surrounding the alleged injury.
Petitioners' bright-line rule, in contrast, dispenses with any
such subtlety. It makes the location of the plaintiff's resi-
dence determinative, thus barring all foreign plaintiffs, ex-
actly as *RJR Nabisco* said it was not doing.

A contextual approach to the domestic-injury requirement
also better reflects the requirement's origin in step two of
the extraterritoriality framework, which assesses whether
there is a domestic application of a statute by looking to the
statute's focus. *RJR Nabisco* implied that the focus of
§ 1964(c) is injuries in "business or property by reason of a
violation of [RICO's substantive provisions]." § 1964(c).
This focus makes sense because, in the context of RICO, "the
compensable injury necessarily is the harm caused by predi-
cate acts sufficiently related to constitute a pattern, for the
essence of the violation is the commission of those acts in
connection with the conduct of an enterprise." *Sedima, S.*

---

[3] The alleged RICO violation must have proximately caused the injury
in order for the plaintiff to be able to sue under § 1964(c). See *Holmes* v.
*Securities Investor Protection Corporation*, 503 U. S. 258, 268 (1992);
*Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 457–458 (2006) (des-
cribing the proximate causation requirement as a "directness
requiremen[t]").

*P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 497 (1985).  So understood, § 1964(c)'s focus is on the injury, not in isolation, but as the product of racketeering activity.  Thus, in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury.  If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury.

Because of the contextual nature of the inquiry, no set of factors can capture the relevant considerations for all cases.  RICO covers a wide range of predicate acts and is notoriously "expansive" in scope.  *Id.*, at 498–499.  Thus, depending on the allegations, what is relevant in one case to assessing where the injury arose may not be pertinent in another.  While a bright-line rule would no doubt be easier to apply, fealty to the statute's focus requires a more nuanced approach.

D

This suit illustrates well why the domestic-injury inquiry must account for the facts of the case, rather than rely on a residency-based rule.  While it may be true, in some sense, that Smagin has felt his economic injury in Russia, focusing solely on that fact would miss central features of the alleged injury.  Zooming out, the circumstances surrounding Smagin's injury make clear it arose in the United States.

Smagin alleges that he "has been injured in his inability to collect [his] massive judgment."  App. 38a.  Much of the alleged racketeering activity that caused the injury occurred in the United States.  Yegiazaryan took domestic actions to avoid collection, including allegedly creating U. S. shell companies to hide his U. S. assets, submitting a forged doctor's note to a California District Court, and intimidating a U. S.-based witness.  It is true that other components of the scheme occurred abroad.  As Smagin alleges, however, even those "wrongful acts and plans were devised, initiated, and

carried out . . . through acts and communications initiated in and directed towards Los Angeles County, California," with the "central purpose of frustrating enforcement of [the] California judgment." *Id.*, at 45a–46a.

Further, the injurious effects of the racketeering activity largely manifested in California. Smagin obtained a judgment in California because that is where Yegiazaryan lives, and where Smagin had thus hoped to collect. The rights that the California judgment provides to Smagin exist only in California, including the right to obtain postjudgment discovery, the right to seize assets in California, and the right to seek other appropriate relief from the California District Court. The alleged RICO scheme thwarted those rights, thereby undercutting the orders of the California District Court and Smagin's efforts to collect on Yegiazaryan's assets in California.

In sum, Smagin's interests in his California judgment against Yegiazaryan, a California resident, were directly injured by racketeering activity either taken in California or directed from California, with the aim and effect of subverting Smagin's rights to execute on that judgment in California. On the Court's contextual approach, those allegations suffice to state a domestic injury in this suit.

## III

Petitioners argue that a contextual approach is inconsistent with certain common-law principles, which instead favor their bright-line rule. According to petitioners, because Smagin has alleged an "economic injury" or an "injury in intangible property," Brief in Opposition 15–16, courts should look to common-law principles governing "the situs" of such injuries, when determining whether those injuries are foreign or domestic. Specifically, as to economic injuries, petitioners point to the Restatement (First) of Conflict of Laws § 377 (1934), from which they discern the principle that "a fraud plaintiff suffer[s] an economic loss at the plain-

tiff's domicile." Brief for Petitioners 36; see also *Sack* v. *Low*, 478 F. 2d 360, 366 (CA2 1973) (Under the First Restatement, "loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence"). As to intangible injuries, petitioners further rely on the principle of *mobilia sequuntur personam*, which they claim "generally locat[es] intangible property at the domicile of its owner." Brief for Petitioners 44. Both principles, they argue, locate Smagin's alleged injury at his residence.

Petitioners fall short, however, when explaining the relevance of these principles. They do not clearly explain why choice-of-law principles are germane here, let alone why the First Restatement dictates those principles.[4] Meanwhile, it is far from clear that petitioners' gloss on the principle of *mobilia sequuntur personam* was as well established or as wide sweeping as petitioners take it to be, in light of the many twists and turns in the doctrine across a range of contexts. See A. Simowitz, Siting Intangibles, 48 N. Y. U. J. Int'l L. & Pol. 259, 270–292 (2015). In short, at the time of RICO's enactment, both principles were hardly "settled . . . at common law." *Beck* v. *Prupis*, 529 U. S. 494, 500 (2000).

The core problem with petitioners' approach is that it is unmoored from the presumption against extraterritoriality. While legal fictions regarding the situs of economic injuries and intangible property have their justifications in other areas of law, those justifications do not necessarily translate to the presumption against extraterritoriality, with its dis-

---

[4] Although the First Restatement was in effect in 1970, when RICO was enacted, numerous jurisdictions had by then moved away from the First Restatement's methodology and toward a " 'most significant relationship' " test, which resembles "the kind of 'multi-factor' analysis the Court of Appeals conducted here." Brief for George A. Bermann as *Amicus Curiae* 15. This shift was reflected in §145 of the Restatement (Second) of Conflict of Laws, which superseded the First Restatement the following year in 1971. Thus, even assuming choice-of-law principles are relevant, petitioners' identification and application of those principles is questionable.

tinctive concerns for comity and discerning congressional meaning.

Indeed, it is because petitioners' view invokes these fictions that it generates results so counter to comity and so far afield from any reasonable interpretation of what qualifies as a domestic application of § 1964(c). On petitioners' primary view, a business owner who resides abroad but owns a brick-and-mortar business in the United States cannot bring a § 1964(c) suit even if an American RICO organization burns down her storefront. Perhaps aware of how odd this seems, petitioners offer a fallback rule for intangible property. That rule fares no better. It provides that if racketeering activity targets the intangible business interests of two U. S. businesses, one owned by a U. S. resident and one owned by someone living abroad, only the former business owner can bring a § 1964(c) suit. There is no evidence Congress intended to impose such a double standard, especially because doing so runs its own risks of generating international discord. These implausible consequences are strong evidence that petitioners have gone astray in assessing the focus of § 1964(c) and, thus, the meaning of "domestic injury" as contemplated by *RJR Nabisco.*

Finally, petitioners, as well as the dissent, *post*, at 553 (opinion of ALITO, J.), argue that a contextual approach is unworkable because it does not provide a bright-line rule. Reply Brief 17–18. An approach is not unworkable, however, merely because it directs courts to consider the case-specific circumstances surrounding an injury when assessing where it arises. While "the ease with which [petitioners'] bright-line rule can be applied gives it some surface appeal," *Humphrey*, 905 F. 3d, at 709, a look beneath the surface quickly reveals that the test is inconsistent with *RJR Nabisco*, the presumption against extraterritoriality, and the thrust of § 1964(c) itself. Concerns about a fact-intensive test cannot displace congressional policy choices, where a more nuanced test is true to the statute's meaning.

ALITO, J., dissenting

\*          \*          \*

A plaintiff has alleged a domestic injury for purposes of §1964(c) when the circumstances surrounding the injury indicate it arose in the United States. Smagin alleges that he was injured in California because his ability to enforce a California judgment in California against a California resident was impaired by racketeering activity that largely occurred in or was directed from and targeted at California. Those allegations state a domestic injury. The judgment of the Ninth Circuit is affirmed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO, with whom JUSTICE THOMAS joins, and with whom JUSTICE GORSUCH joins as to Part I, dissenting.

These are the first cases in which we have been required to decide when injury to intangible property that a civil plaintiff attributes to a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) qualifies as a "domestic injury" and may therefore provide the basis for recovery under 18 U. S. C. §1964(c). See *RJR Nabisco, Inc.* v. *European Community,* 579 U. S. 325, 346–354 (2016). This question has divided the lower courts, but the Court's decision resolves very little. It holds only that ascertaining the site of intangible injuries for purposes of civil RICO requires a court to consult a variety of factors and that two factors it identifies show that respondent has suffered a domestic injury. This analysis offers virtually no guidance to lower courts, and it risks sowing confusion in our extraterritoriality precedents. Rather than take this unhelpful step, I would dismiss the writ of certiorari as improvidently granted.

I

We granted certiorari "to resolve [a] Circuit split" between, on the one hand, the Third and Ninth Circuits, which

embrace a totality-based inquiry like the one the Court adopts here, and, on the other hand, the Seventh Circuit, which has held that RICO injuries to intangible property are sited at the plaintiff's residence. *Ante*, at 540; compare *Humphrey* v. *GlaxoSmithKline PLC*, 905 F. 3d 694, 706–707 (CA3 2018), and 37 F. 4th 562, 567–568 (CA9 2022) (case below), with *Armada (Sing.) PTE Ltd.* v. *Amcol Int'l Corp.*, 885 F. 3d 1090, 1094–1095 (CA7 2018).[1] The Seventh Circuit's decision, however, contains little analysis and simply declares that "[i]t is well understood that a party experiences or sustains injuries to its intangible property at its residence." *Id.*, at 1094; see also *Czyzewski* v. *Jevic Holding Corp.*, 580 U. S. 451, 471 (2017) (THOMAS, J., dissenting) (referring to a dearth of "reasoned opinions . . . from the courts of appeals" regarding "a novel and important question"). The Third and Ninth Circuits, for their parts, did not coalesce around any common set of factors to guide the civil RICO domestic-injury inquiry for intangible-property claims. See *Humphrey*, 905 F. 3d, at 706–707; 37 F. 4th, at 567–568. And no court of appeals has even broached the possibility that different categorical rules might be available for different types of intangible property (*e. g.*, perhaps there could be a rule that injuries to trademark rights should be sited in the country that provided the trademark). "[W]e would greatly benefit from the views of additional courts of appeals on this question." *Czyzewski*, 580 U. S., at 472 (THOMAS, J., dissenting).

Bringing clarity to this area of the law is not an easy task, and I must conclude that the Court falls short. It cites petitioners' domestic racketeering conduct and the California rights conferred by the California judgment Smagin has obtained to enforce his London arbitral award, but it gives no

---

[1] The Second Circuit has adopted a bright-line rule that RICO injuries to *tangible* property are sited at the location of the property. *Bascuñán* v. *Elsaca*, 874 F. 3d 806, 818–824 (2017). The Second Circuit's holding is not implicated in this split, nor did that court offer any analysis of intangible property relevant to these cases.

ALITO, J., dissenting

indication of the relative import of each of these factors. *Ante*, at 545–546. And while the Court appears to envision a long list of factors that might be relevant to this inquiry, see *ante*, at 545, it mentions none other than these two. Nor does it say anything about the circumstances that would call for consideration of additional factors, when such factors might outweigh one or both of the ones it mentions, or what these other factors might be.

Of course, under the majority's all-factors-considered approach, many other features of this very suit *could* be relevant, such as the history and location of the underlying dispute, where any relevant business relationships were formed, Smagin's residence, and the existence of the London arbitral award. Are future courts to infer that these matters have no import? It is difficult to come to any other conclusion given that the Court pays them no heed in undertaking what is ostensibly an examination of all relevant "contex[t]." *Ante*, at 543–545. But it is equally difficult to see why they are irrelevant (especially in light of the Court's unexplored acknowledgment that "in some sense, . . . Smagin has felt his economic injury in Russia," *ante*, at 545), or what room the Court is leaving for additional factors to be identified if none of these counts. And because the Court sets aside the factors that would favor petitioners, it also provides no guidance on how to weigh competing considerations that do not all point toward the same result.

One might additionally think that the nature of the intangible property itself could be relevant under the majority's approach, such as whether the property is a debt, a stock, a trademark, etc. In these cases, however, the relationship between the California judgment Smagin has obtained and the underlying arbitral award that that judgment confirmed is uncertain, so the precise property at issue is another aspect of this suit that is shrouded in confusion. Smagin acknowledged at oral argument that even though he has obtained multiple judgments confirming the arbitral award, he can collect on only one. See Tr. of Oral Arg. 49. There is

thus at least some relevant relationship between the California judgment and the London arbitral award—the latter of which is not "domestic" in any way—but the Court does not address this point, either.

Even with respect to the two factors it focuses on, the Court engenders confusion. It offers no hint which of the two might be more important (should they point in different directions), whether either or both are necessary, or whether either is sufficient. And the Court acknowledges that there was also substantial foreign conduct in these cases, but writes that off because it was "'initiated in and directed towards'" the United States. *Ante*, at 546. Once more, I am unsure of the origin or scope of this rule. If domestic conduct is "initiated in" a foreign nation, does that make it foreign? What exactly does it mean to direct conduct "towards" the United States? All in all, were I a lower-court judge, I would struggle to apply today's decision to any set of facts other than the precise combination present here. In my view, it is not worth our deciding a case when we provoke so many more questions than we provide answers. That is especially so now that the lower courts must additionally decide whether and how today's cryptic decision binds them, rather than continuing to think through unencumbered when intangible-property injuries are the basis of a domestic application of civil RICO.

II

It is not just that we are contributing little by deciding these cases, however; we are also risking significant harm, particularly to the uniformity of our case law. A thrust of our international-comity jurisprudence is that we should not lightly give foreign plaintiffs access to U. S. remedial schemes that are far more generous than those available in their home nations. See *RJR Nabisco*, 579 U. S., at 347–348; *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 166–167 (2004). In light of RICO's unusually plaintiff-friendly remedies, that concern applies in spades here. See *RJR Nabisco*, 579 U. S., at 348. But in today's decision, the

Court countenances that the plaintiff's residence may play no role *at all* in the civil RICO extraterritoriality inquiry. The Court justifies this result with the assertion that favoring U. S. plaintiffs' access to American courts over that of foreign plaintiffs "runs its own risks of generating international discord," *ante*, at 548, a concern that the Court directly rejected in *RJR Nabisco*, see 579 U. S., at 361 (Ginsburg, J., dissenting in relevant part).

Additionally, we have placed a premium on workability in our extraterritorial-application cases. The Court acknowledges that a bright-line rule would be preferable here, but essentially shrugs: RICO is too "nuanced" for that. *Ante*, at 545, 548. Our cases do not let us off the hook so easily. Compare *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 258–259 (2010) ("There is no more damning indictment of the [Second Circuit's] 'conduct' and 'effects' tests than the Second Circuit's own declaration that 'the presence or absence of any single factor which was considered significant in other cases . . . is not necessarily dispositive in future cases'"), with *ante*, at 545 ("[N]o set of factors can capture the relevant considerations for all cases").

Perhaps there is a reason why RICO justifies these departures from our customary rules, but I have no confidence in reaching that conclusion now (let alone *sub silentio*). *RJR Nabisco* was relatively recent, and there have been only a small number of court of appeals decisions implementing it, and even fewer with respect to intangible property. Moreover, unlike in our typical extraterritoriality case, we have received no input here from the sovereign states our rules will affect, including the U. S. Government. *RJR Nabisco*, 579 U. S., at 348; *Morrison*, 561 U. S., at 269; *F. Hoffmann-La Roche*, 542 U. S., at 167–168.

\*          \*          \*

The only rule of law that the Court announces today is that there is no rule, and despite offering such minimal guidance regarding how to site a RICO injury, the Court nonetheless

manages to sow confusion regarding our broader law of extraterritoriality. Respectfully, the most we could contribute to this issue at this juncture is to stay away from it. I would dismiss the writ of certiorari as improvidently granted.

Page Proof Pending Publication

## REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None