# Third District Court of Appeal

## State of Florida

Opinion filed November 5, 2025.

_____

No. 3D23-880
Lower Tribunal No. 04-11813
_____


**Steve Ferguson,**
Appellant,

vs.

**The Republic of Trinidad and Tobago, et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Reemberto Diaz, Judge.

León Cosgrove Jiménez LLP, and Scott B. Cosgrove and William A. O'Leary; The Law Office of Stephen James Binhak, P.L.L.C., and Stephen J. Binhak; Ropes & Gray LLP, and Douglas Hallward-Driemeier and Isaac C.H. Sommers (Washington, DC) and Philip P. Ehrlich (Chicago, IL), for appellant.

White & Case LLP, and Raoul G. Cantero and James N. Robinson and Ryan A. Ulloa and Wyatt R. Smith (New York, NY), for appellees.

Before LOGUE, GORDO and LOBREE, JJ.

## ON MOTION FOR REHEARING, REHEARING EN BANC, AND CERTIFICATION

LOBREE, J.

We deny Appellant's motion for rehearing, rehearing en banc, and certification but withdraw our previous opinion and substitute the following opinion in its stead.

Following nineteen years of litigation, with six related interlocutory proceedings and a month-long trial, Steve Ferguson ("Ferguson") appeals from a final judgment rendered upon a jury verdict finding that he committed civil fraud, conspiracy to commit fraud, and violated Florida's Civil Remedies for Criminal Practices Act, sections 772.103(3) and (4), Florida Statutes (portions of "Florida's Civil RICO Act"). Upon our thorough review of the voluminous record evidence viewed in the light most favorable to the jury verdict, we affirm on all grounds. See Alvarez v. All Star Boxing, Inc., 258 So. 3d 508, 512 (Fla. 3d DCA 2018) ("We review the jury's award . . . to see if it is supported by substantial competent evidence viewing the facts and all reasonable inferences in the light most favorable to the verdict."). We write simply to address Ferguson's argument that no domestic injury to the Republic of Trinidad and Tobago, et al. (the "Republic") occurred.[1]

---

[1] While the concurrence asserts that this is a case of first impression as to whether Florida's Civil RICO Act may be applied extra-territorially, this is not

2

Florida's Civil RICO Act is patterned after its federal counterpart, so Florida courts look to federal cases for guidance. See Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc., 881 So. 2d 565, 570 n.1 (Fla. 3d DCA 2004). Federal civil RICO claims require a "domestic injury." See Yegiazaryan v. Smagin, 599 U.S. 533, 543–44 (2023) ("[D]etermining whether a plaintiff has alleged a domestic injury [for purposes of RICO] is a context-specific inquiry that turns largely on the particular facts alleged in a complaint." (quoting Smagin v. Yegiazaryan, 37 F.4th 562, 570 (9th Cir. 2022))). "Specifically, courts should look to the circumstances surrounding the alleged injury to assess whether it arose in the United States. . . . [T]hat means looking to the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." Id.

Here, domestic injury was shown where many parts of the conspiracy and racketeering activity occurred in Florida. Most importantly, the payment

how Ferguson presented the issue to the trial court. Instead, Ferguson contended that the Republic failed to prove it suffered a domestic injury. Because the specific issue was not raised below, we decline to address whether Florida's Civil RICO Act may be applied extra-territorially. See Sunset Harbour Condo. Ass'n v. Robbins, 914 So. 2d 925, 928 (Fla. 2005) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved." (emphasis added) (quoting Tillman v. State, 471 So. 2d 32, 35 (Fla. 1985))).

3

of the overinflated bids and bribes to co-conspirators Raul Guiterrez and Brian Kuei Tung, and the destruction of evidence. Ferguson hatched the conspiracy in Miami, and executed parts of the conspiracy in Miami, where he met with conspirators to ensure selection of the project consultant, concealed transfers through an agreement that he fabricated, reviewed documents relating to conspirators' illicit payments, and transferred over $1 million to Miami accounts held by Gutierrez. Among other things, the evidence showed that Ferguson's co-conspirators lived in and orchestrated the scheme from Florida, where fake invoices and backdated contracts were created and a hard drive containing incriminating evidence was destroyed. Florida-based companies pushed through overpriced bids and funneled kickbacks to Miami-based accounts, and co-conspirator Gutierrez funneled millions of dollars from accounts in Miami to Ferguson's shell accounts at a Bahamian bank and paid another co-conspirator using checks from a business located in Miami. Thus, we hold that a domestic injury occurred in Florida where, over multiple years, wrongful acts and plans were devised, initiated, and carried out through acts and communications initiated in and directed towards Florida. See Yegiazaryan, 599 U.S. at 545–46.

Affirmed.

GORDO, J., concurs.

4

LOGUE, J., concurring

Florida's Civil Remedies for Criminal Practices Act ("Florida Civil RICO"), section 772.104, Florida Statutes, contains no language limiting its extraterritoriality. Nor does it contain language requiring proof of a "domestic injury." As framed in his initial brief, however, Ferguson argues that "Florida Civil RICO, which is patterned after federal RICO, . . . incorporates the same presumption against extraterritoriality" as its federal counterpart and therefore requires proof of a "domestic injury." This is the necessary premise to his further argument that Trinidad and Tobago failed to prove a domestic injury.

In making this argument, Ferguson relies on RJR Nabisco, Inc. v. European Community, 579 U.S. 325 (2016). In RJR Nabisco, Justice Samuel Alito, writing for the majority, found that the federal counterpart to Florida Civil RICO had no extraterritorial application and therefore required proof of a domestic injury. Id. at 346. In doing so, he set forth "a two-step framework for analyzing extraterritoriality issues." Id. at 337. "At the first step," he held, "we ask whether the presumption against extraterritoriality has been rebutted— that is, whether the statute gives a clear, affirmative indication that it applies

extraterritorially." Id. "If the statute is not extraterritorial," he wrote, "then at the second step we determine whether the case involves a domestic application of the statute," i.e. a "domestic injury." Id.

Whether this same analysis applies to Florida Civil RICO is a case of first impression for a district court in Florida. Accordingly, while I concur with my colleagues that the judgment should be affirmed, I believe a discussion of the "two-step framework for analyzing extraterritoriality issues" is warranted.

**BACKGROUND**

Steve Ferguson appeals a final judgment after a jury trial in the amount of $131,318,840.47. The jury found that Ferguson and his co-defendants engaged in a decades-long scheme to fraudulently overcharge the Republic of Trinidad and Tobago for contracts to build a new airport.

Because this appeal comes to us after a jury trial, the facts are viewed in the light most favorable to the jury's verdict. In 1996, Trinidad and Tobago decided to build a new airport in Port of Spain—the Piarco International Airport. The project was funded by Trinidad and Tobago and was supervised by its entities.

Appellant Ferguson is a citizen and resident of Trinidad and Tobago. Among other things, he heads a group of companies known as the Maritime

6

Group. From 1996 to 2001, while the airport was being built, he served as Chairman of Trinidad and Tobago's National Gas Company, which provided Trinidad and Tobago most of its revenues. In Miami, Ferguson recruited Birk Hillman Consulting, a Florida corporation, to apply to become the lead consultant on the airport project. Ferguson then used his political and economic influence to assist Birk Hillman in being awarded the contract.

Having steered Birk Hillman to the consulting contract, Ferguson warned Birk Hillman that it could "still lose the deal" and demanded a kickback of $1 million. During the course of the arrangement, Birk Hillman or its principals paid Ferguson over $1.1 million. At Ferguson's direction, Birk Hillman or its principals took pains to conceal the payments by transferring the moneys through front firms owned by them to front firms owned by Ferguson.

Regarding a contract to build certain interiors at the airport, a consultant of Trinidad and Tobago estimated the cost to be $20 million. The conspirators arranged to have Northern Construction Corporation, based in Miami, submit an inflated bid for $29 million. Ferguson directed Birk Hillman to recommend the inflated bid despite the price differential. On Birk Hillman's advice, the bid was accepted.

After receiving the contract, Northern then paid $2 million to a Bahamian shell company controlled by Ferguson. Ferguson transferred $335,000 of that money "for no apparent legitimate reason" to one of Trinidad and Tobago's officials who voted to award the contract to Northern. Ferguson also used that money to buy two residential properties for that official in Miami. That official, Brian Kuei Tung, was one of Ferguson's co-defendants in this case.

Regarding a contract to obtain and build systems like baggage handling and jet bridges, a consultant of Trinidad and Tobago estimated the cost to be $15 million. The conspirators arranged to have Calmaquip Engineering Corporation, a Florida corporation, submit an inflated bid for $30 million. To make this bid appear reasonable, they had a Florida subsidiary of Soares da Costa SDC, a Portuguese company, present a larger bid of $35 million. The Florida subsidiary used faux corporate stamps to make it appear the Portuguese company was making the bid rather than its Florida subsidiary. The Florida subsidiary that submitted the faux bid was thirty percent owned by Calmaquip, shared space with Calmaquip in Miami, and had as a director the principal of Calmaquip. Ferguson provided the required bond for this faux bid. Although Hillman-Waller, a principal of Birk Hillman, later testified "there was no justification for a price that high for either bid,"

8

the consulting firm recommended Trinidad and Tobago accept Calmaquip's $30 million bid for what was in essence $15 million worth of work.

After receiving the contract, the principal of Calmaquip transferred millions of dollars to various shell accounts owned by Ferguson in the Bahamas. The principal of Calmaquip, Raul Gutierrez, was a co-defendant in this case. He pled guilty to federal charges of criminal conspiracy for his part in this arrangement and was sentenced to six years in prison. At trial in the instant civil case, he testified at length and admitted that his involvement in this bid-rigging was "probably the biggest mistake in my life."

Regarding another contract concerning maintenance, the jury ultimately found Trinidad and Tobago overpaid by $8.7 million due to similar fraudulent collusion. During construction, moreover, the companies with contracts sometimes paid subcontractors inflated prices in return for kickbacks shared with the other conspirators.

Over time, payments made to Ferguson exceeded $12 million which Ferguson then funneled in part to various government officials and members of the conspiracy. When United States law enforcement began investigating this matter, the parties began creating fake invoices and back-dated contracts to explain the payments. Ferguson directed various individuals to destroy evidence.

During the time at issue, the principals met routinely in Miami to coordinate their efforts. Many of the actions taken to effectuate the conspiracy occurred in Miami. And many of the payments to advance the conspiracy were wired from Miami or to Miami, and sometimes from accounts in Florida to other accounts in Florida. Members of the conspiracy, including one of Ferguson's co-defendants, were charged in federal court in Florida with, and pled guilty to, violating federal laws against fraud.

To pay for part of the project, Trinidad and Tobago obtained a loan in the form of a letter of credit from a bank in Miami. The letter of credit was an asset of Trinidad and Tobago located in Miami and depleted in part by the conspiracy in which Ferguson played a central role.

In 2004, Trinidad and Tobago filed the lawsuit at issue. The operative fifth amended complaint named over 40 defendants. As the case proceeded, all but three settled or were dismissed. The case ultimately went to trial against Ferguson and two co-defendants. The four causes of action against Ferguson were: (1) pattern of criminal activity to obtain proceeds in violation of section 772.103(3), Florida Statutes; (2) conspiracy to obtain proceeds through criminal activity in violation of section 772.103(4), Florida Statutes; (3) common law fraud; and (4) conspiracy to commit fraud.

The case was tried before a jury for a month. During the trial, Ferguson preserved the issue on appeal that I discuss below by moving for a directed verdict, which was denied. The jury ultimately entered a verdict finding Ferguson and his co-defendants liable on all four causes of action. The jury assessed damages in the amount of $32,385,988, for which Ferguson and his two co-defendants were jointly and severally liable. As section 772.104(1) provides for treble damages, the trial court entered a judgment awarding Trinidad and Tobago $97,157,964, plus an additional $38,792,567.72 in prejudgment interest. The trial court offset that amount by $4,631,691.25 from paid settlements and restitution provided to Trinidad and Tobago. Accordingly, the total judgment was entered for $131,318,840.47. This appeal followed.

**DISCUSSION**

On appeal, Ferguson raises multiple points. While the panel affirms on all grounds, I write only to address his claim, as he framed it in his initial brief, that "Florida Civil RICO, which is patterned after federal RICO, . . . incorporates the same presumption against extraterritoriality" as its federal counterpart and therefore requires proof of a "domestic injury."

11

## A. Florida Civil RICO

Florida Civil RICO authorizes a civil cause of action with threefold damages for any person injured by a violation of its substantive prohibitions. § 772.104(1), Fla. Stat. Florida Civil RICO's substantive provisions provide it is unlawful for any person to use the proceeds "from a pattern of criminal activity." §§ 772.103(1), (4), Fla. Stat. A "[p]attern of criminal activity" is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission . . . and are not isolated incidents . . . ." § 772.102(4), Fla. Stat.

Florida Civil RICO is modeled after the federal Racketeer Influenced and Corrupt Organizations Act ("federal RICO"), 18 U.S.C. §§ 1962, 1964. Florida, however, separated its version of the federal RICO into two parts located in different chapters of the Florida Statutes. The part at issue here provides damages in actions brought by private parties and has been named by the Legislature as Florida's "Civil Remedies for Criminal Practices Act." §§ 772.101-.19, Fla. Stat. For convenience, this act is referred to as "Florida Civil RICO." The other part provides criminal penalties, forfeitures, and civil remedies in proceedings commenced, for the most part, by investigative agencies and has been named by the Legislature as "Florida RICO

12

(Racketeer Influenced and Corrupt Organizations) Act." §§ 895.01-.06, Fla. Stat. The name "RICO," however, is often applied to both laws in the caselaw.

Thus, the "Florida RICO statute requires the same elements as a federal RICO claim, but 'violation of the Florida RICO statute requires allegations of predicate acts that violated Florida law, rather than Federal law.'" Drummond v. Zimmerman, 454 F. Supp. 3d 1210, 1217 n.1 (S.D. Fla. 2020) (quoting Asbury v. Slider, No. 8:19-cv-874-T-36SPF, 2020 WL 871097, at *3 n.1 (M.D. Fla. Feb. 21, 2020)). "The elements of a RICO offense under the Florida RICO Act have been described as (1) the existence of an enterprise, which the defendant was employed by or associated with in committing the crimes, (2) a pattern of racketeering activity, and (3) at least two 'incidents' of racketeering or racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission, or that are otherwise interrelated by distinguishing characteristics and are not isolated incidents." Shimek v. State, 610 So. 2d 632, 634–35 (Fla. 1st DCA 1992) (footnote omitted). Without belaboring the point, I believe the evidence before the jury, interpreted in the light most favorable to its verdict, contains sufficient competent substantial evidence to support a finding that these three elements were established.

13

**B. Extraterritoriality**

Because the Florida laws are modeled after federal law, court interpretations of one often shed light on understanding the others. Mese v. State, 824 So. 2d 908, 912 (Fla. 3d DCA 2002) ("[T]he Florida RICO statute is patterned after the federal RICO statute, [and] Florida courts look to federal courts for guidance in construing RICO provisions."); Moorehead v. State, 383 So. 2d 629, 631 (Fla. 1980) ("The Florida legislature incorporated the federal case law by explicitly defining 'pattern of racketeering activity' to include interrelated incidents that are not isolated."). As Ferguson points out, Florida's reliance on federal interpretations of the federal RICO statute raises another point. Under federal RICO, claims for damages brought by private parties are barred if those claims "rest entirely on injury suffered abroad." RJR Nabisco, 579 U.S. at 354.

In RJR Nabisco, the Supreme Court dismissed a claim filed by the European Union for triple damages under federal RICO. The European Union alleged RJR Nabisco allowed its tobacco products to be used as a method of payment for illegal drugs trafficked into Europe. RJR Nabisco responded by arguing that the federal RICO statute providing for civil damages did not apply extraterritorially to its conduct at issue which occurred outside the territory of the United States. Its argument was based on the

canon of statutory construction that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." Id. at 335.

The Court assumed, without deciding, that the European Union's allegations of the involvement by American companies and the use by the alleged conspirators of "the U.S. mails and wires," among other things, sufficiently alleged ties to American commerce to bring the extraterritorial racketeering activity of the conspiracy within the reach of U.S. criminal laws at issue without offending the presumption against extraterritoriality. Id. at 345. The U.S. criminal laws at issue served as the required predicate offenses necessary for application of RICO's civil remedy including the substantive criminal prohibitions contained in RICO itself. Id.

Regarding the federal RICO's civil remedy for damages, however, the Court conducted a different analysis. Writing for the majority, Justice Alito found that the federal counterpart to Florida Civil RICO had no extraterritorial application and therefore required proof of a domestic injury. Id. at 346. In doing so, he set forth "a two-step framework for analyzing extraterritoriality issues." Id. at 337. "At the first step," he held, "we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."

15

Id. "If the statute is not extraterritorial," he wrote, "then at the second step we determine whether the case involves a domestic application of the statute." Id.

The Court went on to hold the presumption against extraterritoriality required the conclusion that the federal RICO's civil remedy had no extraterritorial reach. Therefore, federal RICO's civil remedy was not available for damage claims that "rest entirely on injury suffered abroad." Id. at 354. Because federal civil RICO had no extraterritoriality reach, to obtain the civil remedy of damages, a private plaintiff must "allege and prove a domestic injury." Id. at 346.

Having determined that the federal civil RICO is not extraterritorial, the Court then proceeded to "the second step," namely whether "the case involves a domestic application of the statute." In RJR Nabisco, the plaintiffs had waived any claim of a domestic injury. Therefore, the Court held that the claim against RJR Nabisco was properly dismissed. Id. at 354. Ferguson argues that this analysis applies to Florida Civil RICO.

Like Congress, Florida's sovereign powers allow it to legislate extraterritorially, provided its action is not preempted by federal law and does not run afoul of federal Constitutional limitations: "If the United States may control the conduct of its citizens upon the high seas, we see no reason why

16

the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." Skiriotes v. Florida, 313 U.S. 69, 77 (1941) (recognizing Florida's legislative authority to limit the use of diving equipment "for the purpose of taking commercial sponges from the Gulf of Mexico, or the Straits of Florida" outside Florida waters). See S.E. Fisheries Ass'n v. Dep't of Nat. Res., 453 So. 2d 1351, 1354 (Fla. 1984) ("At the outset we recognize that the state can regulate and control the operation of vessels and the acts of its citizens in waters outside Florida's territorial limits, provided, however, that the federal government has not preempted state regulation."). Indeed, the Florida Legislature continues to legislate extraterritorially in some instances.[1]

---

[1] See, e.g., § 379.365(2)(a), Fla. Stat. (2025) ("A person may not use an expired tag or a stone crab trap tag not issued by the [Fish and Wildlife Conservation Commission] or possess or use a stone crab trap in or on state waters or adjacent federal waters without having a trap tag required by the commission firmly attached thereto."); § 379.3671(2)(c)1., Fla. Stat. (2025) ("A person may not possess or use a spiny lobster trap in or on state waters or adjacent federal waters without having affixed thereto the trap tag required by this section."); § 847.0135(7), Fla. Stat. (2025) ("A person is subject to prosecution in this state pursuant to chapter 910 [of the Florida Statutes] for any conduct proscribed by this section which the person engages in, while either within or outside this state, if by such conduct the person commits a

Like the United States, however, Florida has a presumption against extraterritoriality. See, e.g., Young v. Norwegian Seafarers' Union, 138 So. 3d 1189, 1192 (Fla. 3d DCA 2014) (citing to federal decisions based on the presumption against extraterritoriality and holding, "we similarly decline to extend Florida statutory or common law to reach such disputes, absent an express statement by the Legislature otherwise"); Burns v. Rozen, 201 So. 2d 629, 631 (Fla. 1st DCA 1967) ("Extraterritorial effect of an enactment is not to be found by implication.").

Like the federal civil RICO statute, the Florida Civil RICO statute has no express indication that it is intended to apply extraterritorially. Following the reasoning of the Supreme Court and applying Florida's own presumption against extraterritoriality, the Florida Civil RICO statute does not extend extraterritorially. Because it does not extend extraterritorially, we recognize that the Florida Civil RICO statute, like its federal counterpart, does not apply to claims that rest entirely on injury suffered abroad. Therefore, a plaintiff seeking damages under Florida Civil RICO must show a "domestic injury."

violation of this section involving a child, a child's guardian, or another person believed by the person to be a child or a child's guardian.").

## C. Proof of Domestic Injury

As mentioned above, the Supreme Court in <u>RJR Nabisco</u> did not examine the nature of the required domestic injury because that issue was waived. The Court, however, did address the nature of the required domestic injury in <u>Yegiazaryan v. Smagin</u>, 599 U.S. 533 (2023). Smagin was a resident of Russia. He obtained a multi-million dollar judgment in California against Yegiazaryan who lived in California. Smagin ultimately sued Yegiazaryan under federal RICO for alleged racketeering activities occurring in part in the United States but mainly occurring abroad to hide assets to prevent Smagin's ability to collect the California judgment. Yegiazaryan argued that Smagin failed to allege a domestic injury because the purely economic injury to Smagin occurred where he lived – in Russia.

The Court rejected such "a bright-line rule . . . that locates a plaintiff's injury at the plaintiff's residence." <u>Id.</u> at 543. Instead, the Court held that the analysis to determine if a plaintiff has alleged a domestic injury under RICO "means looking to the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." <u>Id.</u> at 544 (footnote omitted). The Court ultimately determined that Smagin had alleged a domestic injury given "Smagin's interests in his California judgment against Yegiazaryan, a California resident, were directly injured by

19

racketeering activity either taken in California or directed from California, with the aim and effect of subverting Smagin's rights to execute on that judgment in California." Id. at 546. Because interpretations of federal RICO guide this Court's interpretation of Florida's RICO statutes, this federal analysis also applies to the Florida statutes.

Turning from this law to the instant case, one of the first, major acts to advance the conspiracy occurred in Miami—Ferguson's meeting with and recruiting of Birk Hillman, a Florida corporation, to apply to be Trinidad and Tobago's lead consultant on the airport construction. The conspiracy was advanced by meetings among the key conspirators in Florida occurring regularly throughout the conspiracy. Key evidence was located and destroyed in Florida. Some payments to advance the conspiracy occurred entirely in Florida and funds to advance the conspiracy flowed into and out of Florida. The conspiracy involved United States citizens and United States firms. Finally, to pay for part of the project, Trinidad and Tobago obtained a loan in the form of a letter of credit from a bank in Miami. The letter of credit was an asset of Trinidad and Tobago located in Miami and depleted in part by the conspiracy. These circumstances establish that the injury at issue did not "rest entirely on injury suffered abroad." RJR Nabisco, 579 U.S. at 354.

Florida is a world destination for finance, business, and construction. In interpreting Florida's presumption against extraterritoriality, the sovereign state of Florida has a clear interest in preventing, punishing, and providing a remedy for those damaged in part in Florida and in part abroad, as occurred here, by this type of criminal enterprise operating out of Florida. Here, Trinidad and Tobago sufficiently established a domestic injury under Florida Civil RICO.