*PRELIMINARY PRINT*

VOLUME 605 U. S. PART 1

PAGES 38–72

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

APRIL 30, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## FELICIANO *v.* DEPARTMENT OF TRANSPORTATION

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

No. 23–861.   Argued December 9, 2024—Decided April 30, 2025

Tens of thousands of federal civilian employees serve the Nation as military reservists.   When called to active duty, these reservists often receive less pay than they earn in their civilian jobs.   To address this gap, Congress adopted a "differential pay" statute requiring the government to make up the difference between a federal civilian employee's military and civilian pay in various circumstances, including when the reservist is called to active duty "during a national emergency."   At issue here is whether this language guarantees differential pay when a reservist serves on active duty while a national emergency is ongoing, or whether it requires proving a "substantive connection" between the service and a particular national emergency.

Petitioner Nick Feliciano, an air traffic controller with the Federal Aviation Administration, also served as a Coast Guard reserve petty officer.   In July 2012, the Coast Guard ordered him to active duty under 10 U. S. C. § 12301(d), which authorizes activation of reservists with their consent.   He remained on active duty until February 2017, serving aboard a Coast Guard ship escorting vessels to and from harbor. His orders noted that he was called to active duty "in support of" several "contingency operation[s]," including Operations Iraqi Freedom and Enduring Freedom.   Throughout this period, Feliciano did not receive differential pay for his service pursuant to orders under § 12301(d). After the Merit Systems Protection Board rejected his differential-pay claim, he appealed to the Federal Circuit.

Feliciano argued that two statutes entitled him to differential pay: 5 U. S. C. § 5538(a) and 10 U. S. C. § 101(a)(13)(B).   Section 5538(a) requires differential pay for federal civilian employee reservists ordered to active duty "under . . . a provision of law referred to in" § 101(a)(13)(B).   Section 101(a)(13)(B) defines "contingency operation" to include operations that result in the call to active duty of servicemembers under several enumerated statutes "or any other provision of law during a war or during a national emergency declared by the President or Congress."   While acknowledging he was not called up under any of the specifically listed statutes, Feliciano contended that the final phrase entitled him to differential pay because he was ordered to active duty under "any other provision of law" (§ 12301(d)) "during a national emergency."

Syllabus

The Federal Circuit disagreed. Following its earlier decision in *Adams* v. *Department of Homeland Security*, 3 F. 4th 1375, the court held that when a reservist seeks differential pay for service "during a national emergency," he must show not only that he served while a national emergency was ongoing, but also that a substantive connection linked his service to a particular national emergency.

*Held*: A federal civilian employee called to active duty pursuant to "any other provision of law . . . during a national emergency" as described in §101(a)(13)(B) is entitled to differential pay if the reservist's service temporally coincides with a declared national emergency without any showing that the service bears a substantive connection to a particular emergency. Pp. 44–56.

(a) Several considerations support this interpretation. First, the word "during" normally "denotes a temporal link" and means "contemporaneous with." *United States* v. *Ressam*, 553 U. S. 272, 274–275. It does not generally imply any substantive connection. Absent evidence that Congress intended a specialized meaning, those governed by law are entitled to rely on its ordinary meaning. Pp. 44–46.

(b) Contextual clues strengthen this conclusion. When Congress intends to require both temporal and substantive connections, it has done so expressly, using phrases like "during and in relation to" or "during and because of" in various statutes. So the absence of any words hinting at a substantive connection in the statute at issue here supplies a telling clue that it operates differently and imposes a temporal condition alone. See *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 704. Additionally, one of the specific provisions that can trigger differential pay, 10 U. S. C. §12302, authorizes activation of reservists "[i]n time of national emergency"—language the government contends speaks only temporally. If that phrase requires no substantive connection, it is implausible that "during a national emergency" in §101(a)(13)(B) would do so. Moreover, requiring a substantive connection would create interpretive difficulties, as the statute provides no principled way to determine what kind of substantive connection would suffice. The government's interpretation would also create tension with 18 U. S. C. §209, potentially criminalizing differential pay given by private employers to reservists, even though nothing in the phrase "during a national emergency" tells a private employer that a substantive connection is required, let alone what sort of connection must exist. Finally, when the Congressional Budget Office scored similar legislation to help Congress understand the likely impact of proposed legislation, it calculated costs based on "the total number of reservists on active duty," not just those engaged in emergency-related duties. CBO's approach provides further evidence

Syllabus

of how an ordinary reader might have understood the statutory language at issue here. Pp. 46–48.

(c) The government's counterarguments are unpersuasive. First, although the word "during" can sometimes imply more than a temporal connection depending on context, in this statutory context a purely temporal relationship is meaningful. A reservist's active-duty service during a national emergency bolsters the government's capacity to address that emergency whether or not his service directly relates to it. Second, the government's surplusage argument—that a temporal-only reading would render the phrase meaningless given the perpetual existence of national emergencies—fails for several reasons: The interpretation leaves no part of the statute without work to do; the argument depends on contingent factual assumptions about the permanence of emergency declarations; similar statutes use temporal language without requiring substantive connections; and the statute provides no principled way to determine what kind of substantive connection would suffice. Finally, the potential policy consequences the government highlights cannot overcome the statute's most natural reading. Pp. 49–56.

Reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, KAGAN, and JACKSON, JJ., joined, *post*, p. 56.

*Andrew T. Tutt* argued the cause for petitioner. With him on the briefs were *John P. Elwood, Daniel Yablon, Matthew L. Farley,* and *Brian J. Lawler.*

*Nicole Frazer Reaves* argued the cause for respondent. With her on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Fletcher,* and *Geoffrey M. Long.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Texas et al. by *Ken Paxton,* Attorney General of Texas, *Brent Webster,* First Assistant Attorney General, *Aaron L. Nielson,* Solicitor General, *Kyle D. Highful,* Assistant Solicitor General, and *J. Andrew Mackenzie,* Assistant Attorney General, by *Alan Wilson,* Attorney General of South Carolina, *Robert D. Cook,* Solicitor General, *J. Emory Smith, Jr.,* Deputy Solicitor General, and *Thomas T. Hydrick* and *Joseph D. Spate,* Assistant Deputy Solicitors General, and by the Attorneys General for their respective jurisdictions as follows: *Kris Mayes* of Arizona, *Tim Griffin* of Arkansas,

Page Proof Pending Publication

JUSTICE GORSUCH delivered the opinion of the Court.

Tens of thousands of federal civilian employees serve the Nation as military reservists. When the military calls those reservists to active duty, it often pays them less than they earn in their civilian jobs. Seeking to address that gap, Congress some years ago adopted a "differential pay" statute. That law requires the government to make up the difference between a federal civilian employee's military and civilian pay in various circumstances, including when he is called to active duty "during a national emergency." The question we face concerns the meaning of that quoted language. Does it guarantee a reservist differential pay when he serves on active duty while a national emergency is ongoing, or does it require a reservist to prove that his service bears a "substantive connection" to a particular national emergency?

I

Nick Feliciano began working for the Federal Aviation Administration as an air traffic controller in 2005. App. to Pet. for Cert. 9a. At the same time, Mr. Feliciano served as a reserve petty officer in the United States Coast Guard. *Ibid.*; Brief for Respondent 6. In July 2012, the Coast

———

*Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Brian L. Schwalb* of the District of Columbia, *Ashley Moody* of Florida, *Kwame Raoul* of Illinois, *Brenna Bird* of Iowa, *Russell Coleman* of Kentucky, *Anthony G. Brown* of Maryland, *Keith Ellison* of Minnesota, *Lynn Fitch* of Mississippi, *Michael T. Hilgers* of Nebraska, *Dave Yost* of Ohio, *Ellen F. Rosenblum* of Oregon, *Michelle A. Henry* of Pennsylvania, *Jonathan Skrmetti* of Tennessee, *Jason S. Miyares* of Virginia, *Patrick Morrisey* of West Virginia, and *Josh Kaul* of Wisconsin; for the American Federation of Government Employees by *Matthew W. Milledge*, *David A. Borer*, and *Andres M. Grajales*; for Members of Congress by *Timothy Taylor* and *Sarah Kelly-Kilgore*; for Military-Veterans Advocacy, Inc., by *Melanie L. Bostwick* and *John B. Wells*; for the National Law School Veterans Clinic Consortium by *Katie M. Becker* and *Brent G. Filbert*; and for the Reserve Organization of America by *Scott A. Felder*.

Guard ordered him to active-duty service and, for the most part, he remained on active duty until February 2017. App. to Pet. for Cert. 14a.

During much of that period, the statutory authority for Mr. Feliciano's active-duty service came from 10 U. S. C. § 12301(d). As a general matter, that provision authorizes the activation of reservists with their consent. Mr. Feliciano's § 12301(d) orders noted that he was called to active duty to serve "in support of" several "contingency operation[s]," including Operation Iraqi Freedom and Operation Enduring Freedom. App. to Pet. for Cert. 33a, 75a–76a; Brief for Respondent 7. Throughout his active-duty service, Mr. Feliciano served onboard a Coast Guard ship escorting other vessels to and from harbor. Brief for Petitioner 8; Brief for Respondent 6.

While Mr. Feliciano served on active duty pursuant to orders under § 12301(d), the government did not afford him differential pay. App. to Pet. for Cert. 31a, 34a–37a. Eventually, that led Mr. Feliciano to seek relief from the Merit Systems Protection Board. *Id.*, at 8a, 34a–37a. There, he claimed the FAA had created a hostile work environment and unlawfully denied him differential pay during the time he spent serving on active duty under § 12301(d). After the Board rejected his claims, see *id.*, at 29a–30a, 37a, Mr. Feliciano appealed to the Federal Circuit.

On appeal, Mr. Feliciano argued that two statutes entitled him to differential pay: 5 U. S. C. § 5538(a) and 10 U. S. C. § 101(a)(13)(B). See Brief for Petitioner in No. 2022–1219 (CA Fed., Apr. 29, 2022), ECF Doc. 21, p. 19. As relevant here, § 5538(a) requires the government to provide differential pay to a federal civilian employee reservist when the military orders him to active-duty service "under . . . a provision of law referred to in section 101(a)(13)(B) of title 10" of the U. S. Code. Section 101(a)(13)(B), in turn, forms part of the definition of the phrase "contingency operation." A contingency operation, that statute says, includes a "military

operation that . . . results in the call or order to . . . active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12304a, 12305, or 12406 of [title 10], chapter 13 of [title 10], section 3713 of title 14, or *any other provision of law during a war or during a national emergency declared by the President or Congress.*" (Emphasis added.)[1]

Though Mr. Feliciano acknowledged that he was not called up under any of the specific statutes listed in § 101(a)(13)(B), he argued that the statute's closing words, italicized above, entitled him to differential pay. After all, the Coast Guard called him to active duty under another "provision of law" (§ 12301(d)), and his orders came "during a national emergency." ECF Doc. 21, at 21–23. As a result, he contended, he served pursuant to a call to active duty under "a provision of law referred to in 10 U. S. C. § 101(a)(13)(B)," and was thus entitled to differential pay under § 5538(a). *Id.*, at 19, 23.

The Federal Circuit disagreed. Citing its earlier decision in *Adams* v. *Department of Homeland Security,* 3 F. 4th 1375 (2021), the court reasoned that, when a reservist seeks differential pay for service "during a national emergency," he must show not only that he served on active duty while a national emergency was ongoing. He must *also* show a substantive connection between his service and a particular national emergency. App. to Pet. for Cert. 4a. Because Mr. Feliciano had not made that second showing, the court held, he was not entitled to differential pay. *Id.*, at 3a–4a.

_____

[1] Section 101(a)(13)(A) forms the other part of the definition of the phrase "contingency operation." It provides that "contingency operation" also includes "a military operation that . . . is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force." Notably, however, 5 U. S. C. § 5538(a) does not reference this provision for purposes of determining when differential pay is due.

Mr. Feliciano sought review of the Federal Circuit's decision, and we agreed to take his case.   602 U. S. 1037 (2024).

## II

At its core, the dispute before us turns on the meaning of the phrase "during a national emergency."   Does that language promise differential pay to certain federal civilian employees called to active-duty service while a national emergency is ongoing, as Mr. Feliciano argues?   Or does it require a reservist to prove some additional, substantive connection between his service and a particular national emergency, as the Federal Circuit held and the government contends?   Several considerations persuade us that Mr. Feliciano's interpretation is the sounder one.

## A

Start with the word "during."   Normally, we have said, that word "denotes a temporal link" and means "contemporaneous with."   *United States* v. *Ressam,* 553 U. S. 272, 274–275 (2008).   Any number of dictionaries from around the time of § 101(a)(13)(B)'s adoption in 1991 offer up similar formulations.   See, *e. g.*, Black's Law Dictionary 504 (6th ed. 1990) (defining "during" as "[t]hroughout the course of; throughout the continuance of; in the time of; after the commencement and before the expiration of").[2]

Conversely, the word "during" does not generally imply a substantive connection.   The government itself has pre-

_____

[2] Accord, Random House Dictionary of the English Language 608 (2d ed. 1987) (during: "throughout the duration, continuance, or existence of" or "at some time or point in the course of"); Webster's Third New International Dictionary 703 (1993) (during: "throughout the continuance or course of" or "at some point in the course of"); American Heritage Dictionary 572 (3d ed. 1992) (during: "[t]hroughout the course or duration of" or "[a]t some time in").   Dictionaries from the time of § 5538's enactment in 2009 say the same.   See, *e. g.*, American Heritage Dictionary 556 (4th ed. 2006) (during: "[t]hroughout the course or duration of" or "[a]t some time in").

viously acknowledged as much. As its briefing in *Ressam* explained, "[t]he plain everyday meaning of 'during' is 'at the same time' or 'at a point in the course of.' It does not normally mean 'at the same time *and in connection with*.'" Brief for United States in *United States* v. *Ressam*, O. T. 2007, No. 455, pp. 13–14 (emphasis added). Reading "during" to require a substantive connection, the government warned, risks "read[ing] in a relational element" that the word does not necessarily convey. Tr. of Oral Arg. in *United States* v. *Ressam*, O. T. 2007, No. 455, p. 31. Adopting just that view, this Court in *Ressam* held that a sentencing enhancement addressing those who carry an explosive "during" the commission of a felony applies to individuals who carry explosives "contemporaneous with" their felonies even in the absence of a substantive "relationship between the explosive carried and the underlying felony." 553 U. S., at 275.

Sometimes, to be sure, statutory terms can carry meanings that depart from their ordinary ones. Congress may, for example, define a word or phrase in a specialized way or employ a term of art with long-encrusted connotations in a given field. See, *e. g.*, *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 59–60 (2024); *Sekhar* v. *United States*, 570 U. S. 729, 733 (2013). But we have no evidence of anything like that here. And absent such evidence, those whose lives are governed by law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages. See, *e. g.*, *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 86 (2017); *Niz-Chavez* v. *Garland*, 593 U. S. 155, 163 (2021).

Given all that, we think Mr. Feliciano's reading more consistent with the statutory language before us. Just ask yourself how an ordinary American might approach the law's terms. Would he have any reason to think that a reservist called up to active duty "during" a national emergency is entitled to differential pay if, and only if, he can prove his

service has a "substantive connection" to a particular emergency?    We doubt it.

B

Strengthening our conviction on this score are a number of contextual clues.

First, compare the statute before us with other laws. When insisting on both a temporal and a substantive connection in other settings, Congress has commonly made its point expressly.    Up and down the federal criminal code, for instance, statutes speak of actions taken "during *and in relation to*" specified criminal conduct.    18 U. S. C. § 924(c)(1)(A) (emphasis added); see also, *e. g.*, §§ 115(b)(1)(B)(iv), 924(c)(5), 929(a)(1).    When it comes to statutes governing the Armed Forces, Congress has used the phrase "during *and because of* " to describe leave both contemporaneous with and related to a reservist's active-duty service.    5 U. S. C. § 6323(b)(2)(B) (emphasis added).    Congress, too, has exempted from certain statutory requirements the government's acquisition of land when it takes place both "*during* a national emergency" and "*for* national defense purposes." 7 U. S. C. § 4208(b) (emphasis added).    As these examples illustrate, Congress can and does use different words in different provisions to insist on a substantive connection.    But the absence of any words hinting at a substantive connection in the statute before us supplies a telling clue that it operates differently and imposes a temporal condition alone.    See *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 704 (2022).

Next, consider another provision that can trigger differential pay.    Recall that the differential-pay statute—5 U. S. C. § 5538—not only works in concert with § 101(a)(13)(B) to ensure differential pay for certain reservists ordered to active duty "during a national emergency."    It also guarantees differential pay for other reservists called up under specific statutes listed in § 101(a)(13)(B).    See Part I, *supra*.    One such statute, 10 U. S. C. § 12302, authorizes the activation of various reservists "[i]n time of national emergency."    The

government contends that *this* language speaks only tempo-
rally. See Tr. of Oral Arg. 61–62. But if that is true and
the phrase "[i]n time of a national emergency" in § 12302 re-
quires no substantive connection, how might "during a na-
tional emergency" in § 101(a)(13)(B) do so? If a plausible ex-
planation exists for interpreting the one phrase, but not the
other, to require a substantive connection, the government
does not supply it.

Notice, as well, the questions that would follow from insist-
ing on a substantive connection here. To prove a substan-
tive connection, the government suggests, a reservist must
show that he served *in support of* a contingency operation
while on active duty. Brief for Respondent 23–24; Tr. of
Oral Arg. 75–76; *post*, at 71 (THOMAS, J., dissenting) (arguing
the same). But the Federal Circuit applies a more demand-
ing test. On its view, a reservist must show that he served
*directly in* a contingency operation to merit differential pay.
See App. to Pet. for Cert. 4a; *Adams*, 3 F. 4th, at 1379. How
might we choose between these two rules? The statute
does not say. And the fact that Congress supplied no princi-
pled way to determine what kind of substantive connection
is necessary strikes us as yet another sign that the law does
not require any such connection.

Also relevant, to our minds, is how the parties' competing
interpretations interact with 18 U. S. C. § 209. As a rule,
that law makes it a crime for a private party to supplement
a federal employee's salary. See § 209(a). At the same
time, the statute offers an important exception: It allows
a private party to offer differential pay to a reservist-
employee "on active duty pursuant to a call or order to active
duty under a provision of law referred to" in 10 U. S. C.
§ 101(a)(13). 18 U. S. C. § 209(h). On the government's
reading of § 101(a)(13)(B), a private employer would appar-
ently commit a federal crime by providing differential pay to
a reservist on active-duty service while a national emer-
gency is ongoing—unless, of course, the reservist's service

bears a substantive connection to a particular national emergency. But what in the phrase "during a national emergency" tells a private employer that a substantive connection is required, let alone what sort of connection it must be?[3]

Finally, adding to the case against the government's interpretation are the views of others who have come this way before us. The Congressional Budget Office (CBO) provides cost estimates to help Members of Congress understand the likely impact of their proposed legislation. See, *e. g.*, Congressional Research Service, J. Saturno, Introduction to the Federal Budget Process 19 (Jan. 10, 2023). And when CBO scored potential legislation featuring terms that largely mirror those now at issue here, it based its calculations on "*the total* number of reservists on active duty," not those who are *personally* engaged in emergency-related duties. CBO, Cost Estimate, S. 593: Reservist Pay Security Act of 2004, pp. 2–3 (Aug. 4, 2004) (emphasis added); see also CBO, Cost Estimate, S. 2400: Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, p. 9 (July 21, 2004). Of course, no one votes for CBO reports, and courts charged with interpreting the law owe those estimates no rote deference. But CBO's approach does provide further evidence of how an ordinary reader might have understood the statutory language at issue here around the time of the differential-pay statute's adoption. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 388 (2012) (Scalia & Garner).

––––––––––

[3] At oral argument, the government suggested that an employer who mistakenly provides differential pay to a reservist without confirming that his service has the requisite substantive connection to a particular emergency might escape liability for lack of a sufficient *mens rea* to warrant a conviction. See Tr. of Oral Arg. 45–46; see also *United States* v. *Project on Government Oversight*, 616 F. 3d 544, 556–557 (CADC 2010). Maybe so. But that still leaves unanswered the question whether the statute fairly informs an employer what is (and is not) proscribed.

## III

The government and our dissenting colleagues see things differently. They insist that the phrase "during a national emergency" requires a substantive connection between a reservist's service and a particular national emergency. To our minds, however, the government and the dissent do not adequately grapple with the textual and contextual evidence we have set forth. They give short shrift to *Ressam* and the ordinary meaning of the word "during." They brush aside other statutes showing that Congress knows how to impose a substantive connection when it wishes. They do not convincingly explain how §12302 might be read to require only a temporal connection but "during a national emergency" must be read to demand more. They discount CBO's practice. And they nowhere offer a principled basis for preferring the substantive connection they propose over the alternative the Federal Circuit offered.

To be sure, the three central arguments the government and the dissent pursue are not entirely without force. But even on their own terms, each suffers deficiencies and, to our eyes, none suffices to overcome the competing evidence of statutory meaning we have outlined.

## A

The government and the dissent begin by observing that, in at least some contexts, the word "during" can imply more than a temporal connection. Brief for Respondent 14–17; see *post*, at 59–60 (opinion of THOMAS, J.). To illustrate the point, the government asks us to imagine a statute that "referred to any attorney who argues 'during' a court hearing." Brief for Respondent 14. A reader would, the government posits, understand that language "to include only attorneys who argue *in the course of* the hearing—not those who argue elsewhere while the hearing happens to be occurring." *Ibid.*

It's a fair observation. Context plays a vital role when interpreting statutes. And, in the context of the government's hypothetical law, we agree that an ordinary reader would understand it to require both a temporal and substantive connection between an attorney's argument and the court hearing. Really, without a substantive connection, the government's imagined statute would be meaningless, capturing any attorney who happens to argue anywhere in any forum at the same time as the ongoing hearing. The same goes for the dissent's example of a statute defining a "'captured record'" to mean "'material captured during combat operations.'" *Post*, at 60 (opinion of THOMAS, J.) (quoting 10 U. S. C. § 427(g)(1)). There, too, an ordinary reader would understand Congress as referring only to records captured in the course of combat operations, not to all records captured while combat was ongoing somewhere, for without that substantive connection the statute would be senseless.

But we fail to see how that observation translates here. In this statutory context, a purely temporal relationship *is* meaningful. After all, a reservist's active-duty service during a national emergency bolsters the government's capacity to address that emergency; his work on everyday matters may free up others to handle emergent ones. Notably, the government itself argues that Congress has sometimes taken just this view, promising differential pay to certain reservists called to active duty "in time of national emergency," whether or not their service bears a substantive connection to a particular emergency. See Part II–B, *supra* (discussing 10 U. S. C. § 12302). In this context, then, unlike in some others, reading the word "during" to speak only temporally is perfectly sensible.[4]

---

[4] Pursuing a similar argument from statutory context, the dissent submits that, because the phrase "contingency operation" implies some "exigenc[y]" as a matter of "ordinary" usage, the word "during" must entail a substantive connection. See *post*, at 61–63 (opinion of THOMAS, J.). But none of that follows. The phrase "contingency operation" is subject to an

B

Next, the government and the dissent invoke the surplusage canon.  If the phrase "during a national emergency" required only a temporal overlap, the government and the dissent say, it would do practically no work.  After all, the argument goes, there are dozens of declared emergencies today, some have been on the books for years, and it is "unlikely that there will ever be a time when no national emergency exists."  Brief for Respondent 18–19; *post*, at 63–67 (opinion of THOMAS, J.).  The only way to give the phrase "during a national emergency" work to do, we are told, is to interpret it to require a substantive connection.

Here, again, the government and the dissent have something of a point.  With the exception of a brief period in the 1970s, one declared national emergency or another has been ongoing in this country for many decades.  Brief for Respondent 18; *post*, at 63 (THOMAS, J., dissenting).  Even so, this line of argument does not persuade us for a few reasons taken in combination.

For one thing, the surplusage canon is primarily a tool of linguistic interpretation, reflecting an assumption applicable to "all sensible writing: Whenever a reading arbitrarily ig-

---

express statutory definition, to which we must adhere "even if it varies from a term's ordinary meaning."  *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. 149, 160 (2018).  That definition includes a military operation that results in a call to active duty under certain specifically enumerated statutory authorities or under any other law "during a national emergency."  As even the dissent admits, some of the specifically enumerated statutory authorities are "not pegged to [a] specific exigenc[y]."  *Post*, at 62 (opinion of THOMAS, J.).  By way of example, consider again 10 U. S. C. § 12302, which the government says allows it to call reservists to active duty "[i]n time of national emergency" regardless whether their service bears a substantive connection to any particular emergency.  And if the specifically enumerated statutory authorities that help define a "contingency operation" do not always demand a substantive connection between a reservist's service and a particular emergency, we see no reason why the phrase "during a national emergency" must.

nores linguistic components or inadequately accounts for them, the reading may be presumed improbable." Scalia & Garner 174 (internal quotation marks omitted). Nothing in our interpretation of § 101(a)(13)(B) defies that general rule of construction. When a reservist is called to active duty under one of the statutes enumerated in § 101(a)(13)(B), § 5538(a) guarantees him differential pay. And when a reservist is called to active duty under "any other provision of law," he is entitled to differential pay only if a national emergency (or war) is ongoing. See 10 U. S. C. § 101(a)(13)(B); 5 U. S. C. § 5538(a). Linguistically, our reading leaves no part of the statute ignored or left without work to do.

For another, the government and dissent's practical (not linguistic) superfluity argument depends on a contingent factual assumption. Imagine Congress and the President decided tomorrow to end all existing emergencies. No one disputes that our reading of the statute would perform practically significant work in those circumstances, effectively denying differential pay to reservists called to active duty under "any other provision of law." 10 U. S. C. § 101(a)(13)(B). But, the government and the dissent insist, we should ignore that possibility because emergencies have become an immutable feature of modern governance. See Tr. of Oral Arg. 43; *post*, at 63 (opinion of THOMAS, J.).

Maybe so, but maybe not. In the 1970s, the elected branches did something nearly like what the government today considers unthinkable. In 1976, Congress passed and President Ford signed the National Emergencies Act, which effectively ended then-existing emergencies and established procedures for declaring (and concluding) new ones. See 90 Stat. 1255 (codified at 50 U. S. C. § 1601 *et seq.*); Congressional Research Service, E. Webster, National Emergency Powers 7–11 (Nov. 19, 2021). In spite of that intervention, of course, the number of declared emergencies has only grown in the years since. But history may yet repeat itself,

even if the government today considers the prospect "unlikely." Brief for Respondent 19. And it is unclear why we should overlook the most natural linguistic interpretation of this statute's terms based on an assumption that prevailing factual conditions will never change. What is a present fact of the world is not necessarily a permanent one.

For another thing still, the government and dissent's approach invites its own superfluity problems. A number of statutes tie a governmental power or duty to the existence of some ongoing national emergency. For example, Congress has made certain contracting authorities available to the Executive Branch "during a national emergency." 50 U. S. C. §1435. And, as we have seen, Congress has promised differential pay to certain other reservists called to active duty "[i]n time of national emergency." See Part II–B, *supra*. The government maintains that these statutes do not require a substantive connection, only a temporal overlap, with a national emergency. See Brief for Respondent 30; Tr. of Oral Arg. 61–62. Yet, under the government and dissent's view, Congress was wasting its breath with superfluous language in all these laws. A more natural inference, we believe, is that Congress sometimes considers a purely temporal link with a national emergency a salient condition on governmental powers and duties, even if that condition will often be satisfied.

Finally, even if we could somehow overcome all of these problems, we would only find ourselves facing again the question of what kind of substantive tie a reservist's service must have to a national emergency. And, as we have discussed, the statute supplies no obviously principled way for us to resolve what that connection might be. See Part II–B, *supra*.[5]

─────────

[5] The dissent also insists that our reading would render superfluous various postenactment amendments that have expanded the list of provisions enumerated in §101(a)(13)(B). *Post*, at 65–67 (opinion of THOMAS, J.). That argument is mistaken for reasons already discussed: Each of the

C

Failing all else, the government and the dissent worry that our interpretation would invite anomalous policy consequences. Brief for Respondent 22; *post*, at 68 (opinion of THOMAS, J.) (expressing concern about the potential "ripple effects" of our decision). So, for example, the government fears that a purely temporal reading of the phrase "during a national emergency" might require it to provide differential pay to a reservist called to active duty to face a court-martial. Brief for Respondent 22–23. Likewise, the government says, our reading could require differential pay for a reservist called up to attend "training for new Judge Advocates at the Judge Advocate General's Legal Center and School in Charlottesville, Virginia." *Id.*, at 23.

But what does any of that prove? When a party claims that a law yields anomalous policy consequences, its usual recourse lies in Congress, not in the courts where litigants are generally entitled to expect that statutes will "be enforced as written." *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 525 (2018); see also *Patel* v. *Garland*, 596 U. S. 328, 346 (2022) ("[P]olicy concerns cannot trump the best interpretation of the statutory text").

───────

amendments the dissent cites promises differential pay even in the absence of any national emergency. The only possible exception concerns an amendment that, among other things, authorized differential pay *retroactively* for certain members of the Coast Guard for a single year, a year in which there was already an ongoing national emergency. *Post*, at 66 (THOMAS, J., dissenting) (discussing § 681(a), 126 Stat. 1795). But even assuming that one aspect of that single amendment may represent "some redundancy" on our account of § 101(a)(13)(B), the dissent's interpretation results in redundancies of its own and encounters so many other difficulties that we think the "better overall reading of the statute" remains the one we pursue. *Rimini Street, Inc.* v. *Oracle USA, Inc.*, 586 U. S. 334, 346 (2019).

Nor, even taken on their own terms, are the potential consequences the government highlights all that anomalous. Members of the Armed Forces facing court-martial are entitled to their military wages until convicted, 10 U. S. C. § 857(a)(1), and they are presumed innocent until proven guilty, § 851(c)(1). In light of those statutory directions, it is hardly absurd to think Congress might have also wanted a reservist to receive differential pay when called to active duty to answer a court-martial that might acquit him. Much the same goes for reservists called to active duty for training. Whether that training entails learning the finer points of the Uniform Code of Military Justice or attending Airborne School, well-trained reservists are ones the Nation can call on at a moment's notice, as it often has. See, *e. g.*, Brief for State of Texas et al. as *Amici Curiae* 20 ("Within minutes of the September 11 attacks, National Guard and Reservists responded to the call to duty").[6]

\*

In the end, we are persuaded that the statutory language means what its terms most naturally suggest: A federal civilian employee called to active duty pursuant to "any other provision of law . . . during a national emergency" is entitled to differential pay without having to prove that his service

———————

[6] The dissent expresses concern that our interpretation might lead to other "untold consequences," like expanding the "availability of civilian court[s]-martial" or exempting the Department of Defense from having to notify Congress before entering into certain real-estate transactions. *Post*, at 63 (opinion of THOMAS, J.) (citing 10 U. S. C. §§ 802(a)(10) and 2662(f)(1)(E)). We express no views on the dissent's claims except to observe two things. First, as the dissent acknowledges, considerations of constitutional avoidance might counsel in favor of a narrowing construction of certain laws governing courts-martial. See *post*, at 63 (opinion of THOMAS, J.). Second, the result the dissent posits with respect to real-estate transactions is neither unthinkable nor something Congress could not alter to the extent the Constitution allows.

was substantively connected in some particular way to some particular emergency. Because the Federal Circuit held otherwise, its judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE ALITO, JUSTICE KAGAN, and JUSTICE JACKSON join, dissenting.

Federal civilian employees who also serve as military reservists are entitled to "differential pay" when they are called to active-duty service "during a national emergency." See 5 U. S. C. § 5538; 10 U. S. C. § 101(a)(13)(B). Differential pay compensates such reservists for the difference between their military and civilian salaries when active-duty service would otherwise cause a pay cut. The question before us is what Congress meant by the phrase "during a national emergency." Depending on the context, that phrase could require only that a national emergency be concurrently ongoing, or it could require that a reservist's service also be in support of a particular national emergency. Given the context here, I would conclude that a reservist is called to serve "during a national emergency" only if his call comes in the course of an operation responding to a national emergency. Because the Court requires only that an emergency be concurrently ongoing, I respectfully dissent.

## I

### A

"Tens of thousands" of federal civilian employees also serve our Nation as military reservists. *Ante,* at 41. Sometimes these individuals earn lower salaries when called into active-duty military service than they do in their regular jobs. To mitigate this disparity, in 2009 Congress passed the so-called "differential pay" statute, which ensures that

qualifying reservists will continue to receive the amount of their civilian Government salaries while on active duty.   See § 751, 123 Stat. 693–695, as amended, 5 U. S. C. § 5538.   The reservist's civilian employer is responsible for paying the difference.   § 5538(c)(1).

The statute does not, however, grant a blanket authorization for differential pay.   Instead, it makes a federal civilian employee eligible if, as relevant here, he is called to active duty "under . . . a provision of law referred to in section 101(a)(13)(B) of title 10."   § 5538(a).

Section 101(a)(13)(B) is one part of the military's definition of "'contingency operation.'"   This statute defines a "contingency operation" as "a military operation that":

> "(A) is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or
>
> "(B) results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12304a, 12305, or 12406 of this title, chapter 13 of this title, section 3713 of title 14, or any other provision of law during a war or during a national emergency declared by the President or Congress."

The list of cross-referenced provisions in § 101(a)(13)(B) has evolved since Congress first enacted this definition in 1991, but Congress has throughout maintained a catchall for calls to active-duty service under other provisions "during a war or during a national emergency."   See § 631(a), 105 Stat. 1380.

B

Petitioner Nick Feliciano is an air traffic controller for the Federal Aviation Administration (FAA) who also served as

a reserve officer for the United States Coast Guard. The Coast Guard called him to active-duty service for much of the period between July 2012 and February 2017.

Pursuant to Coast Guard policy, each time it called him to active duty, the Coast Guard provided Feliciano orders listing the basis for its call. As relevant here, three of Feliciano's calls specified that he was being "called up under 10 U. S. C. 12301(d) per Executive Order 13223." App. to Pet. for Cert. 75a–76a; App. in No. 22–1219 (CA Fed.), p. 129. Section 12301(d) is not one of the provisions specifically enumerated in § 101(a)(13)(B). It authorizes the Government to "order a member of a reserve component . . . to active duty, . . . with the consent of that member." § 12301(d).

Executive Order No. 13223, in turn, authorizes the military to call reservists to active duty in furtherance of the national emergency declared after the September 11 terrorist attacks. 3 CFR 785 (2001 Comp.). Consistent with that directive, Feliciano's § 12301(d) orders noted that he was being called "in support of a DOD contingency operation," while also listing the relevant operations. App. to Pet. for Cert. 75a–76a; App. in No. 22–1219, at 129.

Feliciano did not immediately seek differential pay from the FAA for his service under these orders. He instead raised the issue in a 2018 appeal to the Merit Systems Protection Board (MSPB), as part of a complaint alleging that the FAA had subjected him to a hostile work environment. The MSPB denied Feliciano's request for differential pay.

The United States Court of Appeals for the Federal Circuit affirmed. 2023 WL 3449138, *1 (May 15, 2023). Feliciano's case turned on whether he had established that his service occurred "during a national emergency" within the meaning of § 101(a)(13)(B). The Federal Circuit concluded that he had not: Under Circuit precedent, Feliciano needed to show a "connection between his service and [an] ongoing national emergency," *id.*, at *2, such that he was "directly called to serve in a contingency operation," *Adams* v. *De-*

*partment of Homeland Security*, 3 F. 4th 1375, 1379 (CA Fed. 2021). But, notwithstanding the language on the face of his orders suggesting that his service was connected to the post-September 11 emergency, Feliciano did not "alleg[e] any connection." 2023 WL 3449138, *2. Instead, he argued only that the Federal Circuit's precedent was wrong, and that any active-duty service should count if there is a national emergency ongoing. We granted certiorari.

## II

### A

This case turns on the meaning of the word "during" in § 101(a)(13)(B). The parties dispute whether the phrase "during a national emergency" covers any reservist who performs active-duty service while a national emergency is ongoing, or whether it requires a connection between the service and the emergency.

As with other common words, the meaning of "during" "depends on the context in and purpose for which it is used." *Wachovia Bank, N. A.* v. *Schmidt*, 546 U. S. 303, 318 (2006). Sometimes, "during" can merely "denot[e] a temporal link," wherein one event need only occur while another event is ongoing. *United States* v. *Ressam*, 553 U. S. 272, 274 (2008). Other times, however, we use "during" in a narrower, relational sense, to reference only events that are substantively connected to the ongoing event—that is, events that occur "in the course of" or "in the process of" the ongoing event. See 3 Oxford English Dictionary 1055 (2d ed. 1989) (emphasis deleted); 4 *id.*, at 1134.

Case law reflects this variation. In *Ressam*, for example, we held that the word "during" was used in the broader temporal sense in 18 U. S. C. § 844(h), which mandates a sentencing enhancement for defendants who "'carr[y] an explosive during the commission of [a] felony.'" 553 U. S., at 274–275 (quoting § 844(h)(2)). That enhancement thus applies to any defendant whose carrying was "contemporaneous with"

his felony, even if it was not "'in relation to' the underlying felony." *Id.*, at 273–275.

Conversely, courts in other contexts have held that the word "during" contains a relational component. For instance, several Circuits have recognized this component in the Sentencing Guidelines' definition of "relevant conduct," which encompasses all actions by the defendant "that occurred during the commission of the offense of conviction." United States Sentencing Commission, Guidelines Manual § 1B1.3(a)(1) (Nov. 2024); see, *e. g.*, *United States* v. *Caldwell*, 128 F. 4th 1170, 1180–1183 (CA10 2025) (collecting cases, and distinguishing *Ressam*). "[W]hen defining '*relevant* conduct,'" they have explained, "the term 'during' conveys a linkage that is more than a mere temporal overlap; it also conveys a qualitative overlap such that the conduct must be *related or connected to* the crime of conviction." *United States* v. *Agyekum*, 846 F. 3d 744, 751 (CA4 2017).

Title 10 also reflects this variation. The Government has suggested that the similar phrase "[i]n time of national emergency" in § 12302 "speaks only temporally." *Ante*, at 46–47 (citing Tr. of Oral Arg. 61–62). But, other provisions in Title 10 appear to speak in relational terms. For example, as the majority acknowledges, when Congress defined "'captured record'" to mean certain "material captured during combat operations," it presumably was describing only material captured in the course of those combat operations. § 427(g)(1); see *ante*, at 50.

The upshot is that the word "during" does not have a single definition on which to hang our analysis. Instead, to determine its meaning here, we must read the § 101(a)(13)(B) catchall "in [its] context and with a view to [its] place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989).

B

The context of § 101(a)(13)(B) makes clear that active-duty service occurs "during a national emergency" within the

meaning of that provision only if the service occurs in the course of a national emergency.   In other words, the reservist must be called to serve in an operation responding to a national emergency.   Several important textual clues counsel in favor of this reading.

1

To start, the scope of the phrase "during a national emergency" is limited by §101(a)(13)(B)'s location within Congress's definition of "contingency operation."   Because "an entirely artificial definition is rare," we typically expect the meaning of a definition to be "closely related to the ordinary meaning of the word being defined."   A. Scalia & B. Garner, Reading Law 228 (2012) (Scalia & Garner).   Thus, the "ordinary meaning of a defined term" often "plays a . . . limiting role" when choosing between possible interpretations. *Bond* v. *United States*, 572 U. S. 844, 861–862 (2014).

This canon applies with full force here.   As a matter of ordinary meaning, the term "contingency operation" in Title 10 refers to the subset of military operations that relates to a particular contingency.   We should therefore expect §101(a)(13) to cover only operations that are part of the military's response to "emergency" situations or otherwise necessitated by "required military operations."   Dept. of Defense Dictionary of Military and Associated Terms 86 (JCS Pub. 1–02 1989).   Otherwise, there would be no reason for Congress to use "contingency" as a modifying adjective.   See *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. 9, 19 (2018) ("Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality").

The other categories of "contingency operations" in §101(a)(13) conform to this understanding.   Section 101(a)(13)(A) covers a paradigmatic kind of contingency operation—those wherein members of the military are likely to be engaged in opposition to "an enemy of the United States or against an opposing military force."   Several of the enumerated provisions in §101(a)(13)(B) similarly cover operations directly responding to specific exigent situations.   See,

*e. g.*, § 12304a ("assistance in response to a major disaster or emergency"); § 12406 ("invasion" or "rebellion"). And, although the remaining cross-referenced provisions are not pegged to specific exigencies, they too sound in exigency, each signaling some reason why a reservist is called to active duty. See, *e. g.*, §§ 12301(a), 12302, 12304.

Because the common thread among these categories is that they contemplate only exigent military operations, it follows that the same should be true of the "during a national emergency" catchall. We ordinarily read catchall "clauses . . . as bringing within a statute categories similar in type to those specifically enumerated." *Federal Maritime Comm'n* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 734 (1973). The catchall here should not be read in a way that eviscerates § 101(a)(13)'s "contingency" focus.

Tellingly, the military itself has understood the term "contingency operation" to have a finite scope. Notwithstanding the existence of ongoing national emergencies, it has for some troop activations issued "orders stat[ing] that they are 'non-contingency' activation orders." *Adams*, 3 F. 4th, at 1377. For example, like Feliciano, the plaintiff in *Adams* consented to "'voluntary active duty under [§ ]12301(d),'" but his orders stated that he was being activated in a "'non-contingency'" capacity. *Id.*, at 1377, 1380.

It follows that the phrase "during a national emergency" cannot be understood in purely temporal terms. A purely temporal construction would eviscerate the specification of "contingency operation": If all military operations that occur concurrent with a national emergency are contingency operations, then *any* military operation requiring a call to active-duty service could be a contingency operation, regardless of whether there is any contingency involved. Such a capacious reading would implausibly divorce the term from its ordinary meaning.

A review of the other provisions in Title 10 that use the term "contingency operation" confirms this implausibility. Because § 101(a)(13) is a definition that "appl[ies throughout]

this title," see § 101, as well as in other provisions where it is incorporated by reference, its definition must fit the broader statutory scheme, *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 222 (2008). There are "dozens of provisions inside and outside Title 10 that are applicable to" contingency operations, and a broad reading of that term would lead to untold consequences. Brief for Respondent 22. For example, for contracting provisions such as § 2662(f)(1)(E)—where Congress created a reporting requirement but provided an exception for contingency operations—a purely temporal interpretation of "contingency operation" would invite the exception to swallow the rule. Likewise, such an interpretation would mean that—under a provision applying the Uniform Code of Military Justice to civilians who accompany the U. S. military in the field "[i]n time of declared war or a contingency operation"—the availability of civilian court-martial could be quite open-ended. § 802(a)(10); see *United States* v. *Ali*, 71 M. J. 256, 261–262 (C. A. Armed Forces 2012). That possibility would run up against our normal understanding of court-martial as a "narrow exception" to the civilian justice system, and exacerbate any constitutional infirmities of this provision. *Reid* v. *Covert*, 354 U. S. 1, 21, 31–33 (1957) (plurality opinion). This implausibility is "strong evidence" that the term "contingency operation" must retain limiting force. *Yegiazaryan* v. *Smagin*, 599 U. S. 533, 548 (2023).

2

The need for "contingency operation" to retain limiting force is particularly apparent because Congress enacted § 101(a)(13)(B) against a backdrop of indefinite and continual national emergencies. With the exception of a 1-year interregnum from 1978 to 1979, the United States has had at least one national emergency in effect at all times since 1933.[1]

--------

[1] Congress took note of this problem in the 1970s. S. Rep. No. 93–549, p. III (1973). It passed the National Emergencies Act in 1976, which ordered that the then-existing emergencies be terminated as of 1978. § 101(a), 90 Stat. 1255 (codified at 50 U. S. C. § 1601(a)). But, the President

Thomas, J., dissenting

Thus, when Congress passed § 101(a)(13)(B) in 1991, it would have expected that some national emergency or other would generally be in effect. It strains credulity to think that Congress could have meant "contingency operation" to mean, as a practical matter, essentially every military operation.[2]

To the extent there could be any doubt, the structure of § 101(a)(13)(B) confirms that Congress did not intend for the "during a national emergency" catchall to be all encompassing. After all, Congress created that provision as a *catchall* to a long list of enumerated provisions. As originally enacted, § 101(a)(13)(B) specified that a "military operation" would qualify as a "'contingency operation'" if it "results in the call or order to, or retention on, active duty" of troops pursuant to one of seven enumerated provisions, one enumerated chapter of provisions, or "any other provision of law during a war or during a national emergency." 105 Stat. 1380. Congress has maintained this structure since then. The only changes it has made have been to enumerate additional statutes. See § 101(a)(13)(B).

Congress's focus on a reservist's "call or order" to active duty and whether that "call or order" arises under specific provisions of law suggests that Congress cared about the

―――――――

soon proclaimed a new emergency to order sanctions against Iran. Exec. Order No. 12170, 3 CFR 457 (1979 Comp.). That emergency remains in effect to this day, alongside several dozen other emergencies since designated. 89 Fed. Reg. 87761 (2024).

[2] Reading the term "contingency operation" to cover all military operations that occur while a national emergency is also ongoing would appear particularly incongruent given the nonmilitary nature of many emergencies. In the years leading up to the 1991 enactment of 10 U. S. C. § 101(a)(13), almost all the emergency proclamations in effect concerned economic sanctions. See Brennan Center for Justice, Declared National Emergencies Under the National Emergencies Act (last updated Apr. 7, 2025), https://brennancenter.org/our-work/research-reports/declared-national-emergencies-under-national-emergencies-act. It is not apparent why the existence of unrelated sanctions, administered by nonmilitary officials, would transform routine military operations into contingency operations as a matter of ordinary understanding.

contents of and the basis for a reservist's activation orders. If Congress had meant to effectively deem all operations requiring calls to active-duty service as occurring "during a national emergency," then its list of enumerated provisions would have been unnecessary. Because some emergency is invariably ongoing, Congress could have omitted all those enumerations without any meaningful difference.

The superfluity involved in a purely temporal reading is a strong sign that a military operation occurs "during a national emergency" only if it occurs in the course of the Government's response to a national emergency. Because we interpret statutes, where possible, to avoid superfluity, we strive to avoid interpretations that "would in practical effect render [statutory language] entirely superfluous in all but the most unusual circumstances." *TRW Inc.* v. *Andrews*, 534 U. S. 19, 29 (2001). We likewise strive to avoid "unbounded interpretation[s]" of a catchall that would "render superfluous" Congress's provision of "a reticulated list" elsewhere in the statute. *Fischer* v. *United States*, 603 U. S. 480, 493 (2024). Reading "during a national emergency" in §101(a)(13)(B) to reach only operations undertaken in the course of the national emergency would avoid these disfavored interpretive outcomes.

3

The postenactment history of both §101(a)(13)(B) and the differential-pay statute that incorporates that provision further counsel in favor of reading "during a national emergency" narrowly. It is well established that "subsequent acts can shape or focus" our selection between possible statutory meanings. *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 143 (2000). And, in particular, we must read "a change in [statutory] language . . . , if possible, to have some effect." *American Nat. Red Cross* v. *S. G.*, 505 U. S. 247, 263 (1992). But here, Congress's postenactment amendments would be superfluous if all military operations

were already contingency operations through the "during a national emergency" catchall.

Most notably, Congress in 2013 amended § 101(a)(13)(B) to specify that military operations requiring troop activations under what is now 14 U. S. C. § 3713—a provision allowing for the emergency activation of Coast Guard reservists in certain circumstances—would henceforth qualify as contingency operations. § 681(a), 126 Stat. 1795. Congress also specified that this amendment would be "retroactive" for one year for purposes of differential pay. § 681(d)(2)(A), *id.*, at 1796. But, if the phrase "during a national emergency" makes all military operations contingency operations while a national emergency is in effect, then this amendment and its retroactivity provision would have been wholly superfluous. With emergencies always in effect, including for the entirety of the 1-year retroactivity period, reservists activated pursuant to the Coast Guard provision would already have been participants in contingency operations and so entitled to differential pay.

Other congressional amendments reflect the same problem. In 2011, Congress amended § 101(a)(13)(B) to deem as contingency operations military operations requiring activations through § 12304a, which allows certain reservists to be called to active duty "[w]hen a Governor requests Federal assistance in responding to a major disaster or emergency." § 515(a), 125 Stat. 1394. And, in 2018, Congress amended the differential-pay statute to entitle reservists activated under 10 U. S. C. § 12304b to differential pay. § 605, 132 Stat. 1795. That provision allows activations for "preplanned mission[s] in support of a combatant command." § 12304b(a). But, given the backdrop of constant national emergencies, these changes could have little, if any, practical effect if § 101(a)(13)(B) already made all military operations contingency operations so long as an emergency is ongoing.

Because we disfavor statutory interpretations that would render statutory language all but superfluous "in practical

effect," it makes little sense to conclude that Congress enacted these amendments in case of a hypothetical day without emergencies. *TRW*, 534 U. S., at 29. This statutory history therefore provides another reason to adopt a cabined reading of the "during a national emergency" language.

\*          \*          \*

Taken together, these contextual clues establish that the "during a national emergency" catchall in §101(a)(13)(B) reaches only military operations conducted in response to a national emergency. The differential-pay statute, in covering any reservist who is called to active duty "pursuant to a call or order" under "a provision of law referred to in section 101(a)(13)(B)," incorporates §101(a)(13)(B)'s limits. 5 U. S. C. §5538(a). Thus, the statutory context of 10 U. S. C. §101(a)(13)(B) also establishes that a reservist qualifies for differential pay under the "catchall" only if he is called to serve in an operation responding to a national emergency. Reservists cannot benefit if they are called to serve merely while other, unrelated emergency responses are ongoing.

### III

The majority does not persuasively grapple with the foregoing evidence of §101(a)(13)(B)'s meaning. At most, its reasoning suggests that Congress could have spoken more clearly. But, that conclusion cannot justify the Court's decision today.

As an initial matter, the majority wrongly puts a thumb on the scale in favor of reading the word "during" in a purely temporal sense. "Normally," it says, "that word 'denotes a temporal link' and means 'contemporaneous with.'" *Ante*, at 44 (quoting *Ressam*, 553 U. S., at 274–275). But, as the majority later acknowledges, the meaning of "during" is context dependent. *Ante*, at 49–50; *supra*, at 59–60. Often, "ordinary reader[s]" will read "during" to "require both a temporal and substantive connection." *Ante*, at 50. Our decision

in *Ressam* is not to the contrary: It stated only that the purely temporal sense was "the most natural reading of the word *as used in the statute*" at issue.   553 U. S., at 274–275 (emphasis added).

Even if the majority were right about "during" as a general matter, we still must read statutes in context.   See *Home Depot U. S. A., Inc.* v. *Jackson*, 587 U. S. 435, 441 (2019) (narrowly reading a term that, "standing alone, is broad").   Here, the majority too quickly brushes aside the key contextual clues in the scheme before us.

To start, the majority cannot disregard the ordinary meaning of "contingency operation" on the ground that we are interpreting an "express statutory definition" of that term. *Ante*, at 50–51, n. 4.   When the meaning of a statutory definition is unclear, "the ordinary meaning of the term . . . is one of 'the most important' factors we can consider."   *Delligatti* v. *United States*, 604 U. S. 423, 438 (2025) (quoting Scalia & Garner 228); see *supra*, at 61.   And, even on the majority's view, the meaning of § 101(a)(13)(B) is at least debatable: The majority acknowledges the "force" of countervailing arguments, and it all but admits that its reading generates superfluity, at least as to Congress's retroactive provision of differential pay under the Coast Guard amendment.   *Ante*, at 49, 53–54, n. 5.

The majority cannot dodge the larger superfluity problem raised by its overbroad reading either.   The majority speculates that there could be a day where no national emergencies are in effect.   *Ante*, at 52–53.   But, given the five-plus decades of national emergencies against which Congress legislated, that possibility is far too remote to reflect Congress's likely intention in enacting § 101(a)(13)(B).   And, Congress's postenactment amendments—including the retroactive amendment—only further confirm that it intended all of § 101(a)(13)(B) to have present effect.

The majority downplays the ripple effects its opinion will have for the term "contingency operation" as used in other

provisions. Notwithstanding its decision to define "contingency operation" to mean essentially "any military operation," the majority offers "no views" on the full consequences of its interpretation. *Ante*, at 55, n. 6. But, Congress made § 101(a)(13) the definition for "contingency operation" throughout Chapter 10 and beyond, and so we "must, to the extent possible, ensure that the statutory scheme is coherent and consistent." *Ali*, 552 U. S., at 222. We cannot leave that obligation for another day.

The majority's competing textual arguments are also unavailing. The majority invokes the presumption of consistent usage and the canon of meaningful variation to argue that a comparison with other statutes shows that "during" in § 101(a)(13)(B) is merely temporal. Under these principles, "[i]n a given statute, the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer* v. *United States*, 601 U. S. 124, 149 (2024). Thus, the majority argues, it is noteworthy that Congress used only the word "during," given that other Code provisions use "during" or equivalent language in a purely temporal sense. *Ante*, at 53. If Congress had wanted to reach only active-duty service undertaken in the course of a national emergency, the majority posits, it would have borrowed different, clearer language, such as "during and in relation to." *Ante*, at 46. These arguments are true as far as they go, but they go only so far.

Because "drafters more than rarely use the same word to denote different concepts, and often . . . use different words to denote the same concept," inferences like the majority's are "particularly defeasible by context." Scalia & Garner 170–171. And, the presumption of consistent usage and canon of meaningful variation carry especially little weight when applied to words that are "ubiquitous" and "context-dependent," whose use drafters are not "likely to keep track of and standardize." *Pulsifer*, 601 U. S., at 149. That is the case with a preposition such as "during," which even the ma-

jority acknowledges to be context dependent, including in its meaning elsewhere in Title 10. See *ante*, at 50; *supra*, at 60. Thus, the majority's arguments on this front cannot be controlling.[3]

Likewise, the interaction of the differential-pay statute with 18 U. S. C. §209 does not move the needle. That statute criminally bars private parties from supplementing a federal employee's salary, but it creates an exception for parties who give differential pay to reservists serving on "active duty under a provision of law referred to in section 101(a)(13)." §§209(a), (h). The majority warns that a narrow reading of 10 U. S. C. §101(a)(13) could create liability for private employers who mistakenly believe an employee to be serving in the course of a national emergency. *Ante*, at 47–48. But, even setting aside that such employers would likely have a *mens rea* defense, see *ante*, at 48, n. 3, this argument for lenity can be relevant only if, "at the end of the process of construing what Congress has expressed[,] . . . the ordinary canons of statutory construction have revealed no satisfactory construction," *Lockhart* v. *United States*, 577 U. S. 347, 361 (2016) (internal quotation marks omitted). Here, those ordinary canons supply an answer.

No more availing is the majority's invocation of the Congressional Budget Office (CBO) as evidence of what an "ordinary reader" might think. *Ante*, at 48. The majority highlights that CBO at one point applied the majority's reading when estimating the cost of "potential legislation featuring [similar] terms." *Ibid.* But, as the majority ac-

---

[3] The majority emphasizes the Government's concession that §12302, one of the provisions enumerated in §101(a)(13)(B), "speaks only temporally" when "authoriz[ing] the activation of various reservists '[i]n time of national emergency.'" *Ante*, at 46–47; see *supra*, at 60. Whatever the merits of that concession, it does not help the majority. Even when read purely temporally, §12302—which allows the Government to maintain "[i]n time of national emergency" a limited "Ready Reserve" of troops who can be activated as needed—has a clear exigency focus. It does not support the majority's near-boundless interpretation of the §101(a)(13)(B) catchall.

knowledges, "no one votes for CBO reports," and courts owe CBO "no rote deference." *Ibid.* It is not apparent, then, why CBO's reports are relevant—particularly given that the reports contain no interpretive analysis.[4] That one generalist agency, for unknown reasons, once shared the majority's view is hardly compelling evidence of § 101(a)(13)(B)'s meaning, especially given the weight of the interpretive clues and the practice of the military itself. See *supra*, at 61–62.

Finally, the majority cannot fall back on workability concerns. The majority asks how a substantive standard can be discerned from the "during a national emergency" language, pointing to the somewhat different formulations that the Government and I have used compared to the Federal Circuit's. *Ante*, at 47, 49. But, "[i]t is not our place to question whether Congress adopted the . . . most workable policy, only to discern and apply the policy it did adopt." *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 706 (2022).

In any event, the majority's concerns are unjustified. However formulated, the inquiry should ordinarily be straightforward. A reservist is eligible for differential pay through the "during a national emergency" catchall if he is called to active-duty service in an operation responding to such an emergency. The nature of an activation can ordinarily be determined from the face of the reservist's activation orders, which, under Department of Defense and Coast Guard policies, must state whether he is being activated in support of a contingency operation. Brief for Respondent 23–24; see *Adams*, 3 F. 4th, at 1379. If there is any ambiguity, the reservist or his civilian employer can obtain clarification. Office of Personnel Management, OPM Policy Guidance Regarding Reservist Differential Under 5 U. S. C. 5538, p. 23 (rev. June 23, 2015), https://www.opm.gov/policy-

―――――――
[4] For the reports, see CBO, Cost Estimate, S. 593: Reservist Pay Security Act of 2004, pp. 2–3 (Aug. 4, 2004); CBO, Cost Estimate, S. 2400: Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, p. 9 (July 21, 2004).

data-oversight/pay-leave/pay-administration/reservist-differential/policyguidance.pdf. The majority has no basis to deviate from the commands of statutory text.

*    *    *

My interpretive conclusion does not mean that Feliciano should be denied differential pay. As even the Government admits, Feliciano's "orders indicate that [he] would have been entitled to differential pay" under a proper reading of §101(a)(13)(B) because they indicate that he was being called to active duty to support the Coast Guard's response to a national emergency. Brief for Respondent 36; see *supra*, at 58. The Government argues, however, that petitioner has forfeited any entitlement. Because we are not a court of first view, I would vacate and remand so that the Federal Circuit may assess these issues in the first instance. The majority instead grants Feliciano relief based on a misreading of the statute. I respectfully dissent.

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None